**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Jerome T. KANE, d/b/a Kane Bag Supply Company, Respondent.**

**No. 14344.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 13, 1970.

Decided Dec. 30, 1970.

Russell Thomas, Jr., Atty., N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Leonard M. Wagman, Atty., N.L.R.B., on brief), for petitioner.

Marvin C. Wahl, Baltimore, Md. (Wahl & Wahl, Baltimore, Md., on the brief), for respondent.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

Having found that Jerome Kane d/b/a Kane Bag Supply Company committed numerous § 8(a) (1) violations during his employees' attempt to unionize, the Board ordered Kane to cease and desist from further violations, to take affirmative steps to remedy the effects of past violations and to bargain with the union. The direction to bargain was predicated upon the findings that Kane's past violations "were of such an extensive and pervasive character" that the order was necessary to repair their effect, and that "the possibility of erasing their lingering coercive effects by the use of traditional remedies is slight" so that the purpose of the Act would be best served by reliance on signed authorization cards rather than an election. In this case an election was never held. The union's petition for an election was withdrawn simultaneously with the filing of unfair labor practice charges.

The Board's petition to enforce requires us to determine if its findings of § 8(a) (1) violations are supported by substantial evidence on the record as a whole and to consider and apply the de-cision in N. L. R. B. v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We conclude to enforce the Board's order.

I

Kane is engaged in the manufacture of sand, burlap and ham bags in Baltimore, Maryland. The appropriate unit for collective bargaining was stipulated by the parties. It comprises 30 production and maintenance employees, none of whom is required to be highly skilled and many of whom are inarticulate and only semi-literate.

In the latter part of April, 1967, the union (Upper South Department, International Ladies' Garment Workers Union, AFL–CIO) undertook a campaign to organize these employees. In about 10 days, 12 employees signed "Application for Membership" cards authorizing the union to represent them "in all matters of collective bargaining with my employer." On May 4, 1967, the union sponsored a meeting attended by 17 employees and a supervisor, later determined not to be a proper member of the unit. After being told that the card check method could be a means of obtaining union recognition and after being told, also, that any authorization cards signed by them could be exhibited to their employer, all 17 signed authorization cards. Since 10 of the 17 and the supervisor had previously signed such cards, the meeting resulted in a net of 6 new authorizations.

The next day the union organizer and the organization director met with Kane and exhibited to him the 18 signed cards (including that of the supervisor). Kane examined the cards, discussed with the representatives his amazement that his employees would want a union, and agreed to meet with the union on May 8 to discuss a contract.

Before May 8, Kane consulted counsel. He told his lawyer that he had not observed anything unusual about the authorization cards, that one was signed by a supervisor, and that he did not know if the signatures were genuine be-

cause he had not checked them, but that he had doubts about a few of the signatures. Kane was advised of his rights as an employer, and his attorney advised the union that Kane would not bargain because he questioned the union's majority status. Two days later the union filed a petition for a Board election.

Beginning on May 5, 1967, Kane embarked on a course of anti-union conduct which we, without feeling the necessity of discussing all of its evidentiary underpinnings, conclude was established by substantial evidence on the record considered as a whole, and which amply supports the conclusion that there were repeated § 8(a) (1) violations of the Act.

On the same afternoon that union representatives first called on him, Kane remarked to employee Drew that he wanted to see her "about this Union mess," and that "he wanted to know whether [Drew] was with him or not, because he didn't want to make a mistake and lay off the wrong one." He remarked to employee Gatheright that she was a good worker and "I don't want to have to let you go." When this employee asked what was wrong Kane responded that it was "[n]o more than what you know."

On May 8, employee Taylor, who had signed a union authorization card, was asked by Kane if she had signed a card. When she replied falsely that she had not, she was told that he knew that she had, and she was solicited to sign a statement stating that she had not signed a union card. Another employee had substantially the same experience on that same date.

On Thursday, May 11, the union told the employees that there would be a board-conducted representation election, and the next day Kane inquired of employee Gatheright if he could count on her. Kane disclosed that he had asked some other employees if he could count on them, and that he "wanted to know who he could keep and who he could let go."

Employee Young was told by Kane during the second week of May that after "this union thing" was over "there was going to be quite a few changes made around here." The next week Young was asked by Kane how he would vote in the election, and he was also asked how his sister and brother would vote. When Young disclaimed knowledge of his sister's inclination and said that he did not know if his brother could be trusted to vote against the union, Young was requested to speak to both. On a later occasion, Kane, in a conversation with Young, referred to several other employees who had signed authorization cards as "holy terrors" and stated that "after this union business is over with they are gone."

On Wednesday, May 24, employee Gatheright was asked if she would attend a union meeting scheduled for the next day. When she replied that she would attend "to see which way the ball bounces," Kane told her it was not necessary for her to go because "he know [sic] everything that was happening at the meeting." In another conversation, Kane asked Gatheright to "talk Grace out of voting for the union." The next day Kane told Gatheright that he, Kane, had talked that employee out of going to the union meeting, and he also said that a former employee, who was not working because of illness, would be rehired in a couple of weeks "after all this was over."

During the preelection period the union conducted meetings periodically, which were attended by 15 or more employees on each occasion. However, as the date for the election approached, attendance at the meetings dropped precipitously, and after only 7 employees had attended the union meeting of June 1, the union withdrew its petition for a board-conducted election and filed unfair labor practice charges.

Clearly, Kane's activities included coercive interrogation, threats of discharge and other reprisals, and creation of the impression that Kane was maintaining surveillance over his employees'

union activity, all in violation of § 8(a) (1).

## II

In a series of decisions, we declined to enforce orders of the Board directing various employers to bargain, although we found that the employers had committed § 8(a) (1) and § 8(a) (3) violations, when the bargaining order was predicated upon the finding of the union's majority status evidenced by signed authorization cards. We did so because of what we thought was the inherent unreliability of the signed authorization cards. Crawford Mfg. Co. v. N. L. R. B., 386 F.2d 367 (4 Cir. 1967), cert. den., 390 U.S. 1028, 88 S.Ct. 1408, 20 L. Ed.2d 286 (1968); N. L. R. B. v. S. S. Logan Packing Co., 386 F.2d 562 (4 Cir. 1967); N. L. R. B. v. Sehon Stevenson & Co., Inc., 386 F.2d 551 (4 Cir. 1967); N. L. R. B. v. Heck's, Inc., 398 F.2d 337 (4 Cir. 1968); N. L. R. B. v. Gissel Packing Co., 398 F.2d 336 (4 Cir. 1968); General Steel Products, Inc. v. N. L. R. B., 398 F.2d 339 (4 Cir. 1968). While declining enforcement of the bargaining portion of the orders in those cases, we nonetheless said that in the "exceptional" case, marked by "outrageous" and "pervasive" unfair labor practices, we would enforce a bargaining order so predicated because the effects of the unfair labor practices could not be eliminated by traditional remedies. N. L. R. B. v. S. S. Logan Packing Co., 386 F.2d at 570. See also N. L. R. B. v. Heck's, Inc., 398 F.2d at 339.

The decisions in *Heck's, Gissel,* and *General Steel* were reviewed, reversed and remanded in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). There, the Court, while recognizing that a secret election is the preferred method of ascertaining if a union has majority support, nonetheless approved the issuance and enforcement of a bargaining order in those instances in which we said in *Logan* and *Heck's* that we would enforce the order. But it described a second category of cases in which a bargaining

order was also appropriate and should be enforced:

> The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate * * * where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. * * *

395 U.S. at 614–615, 89 S.Ct. at 1940.

In addition to describing the second category of cases, the Court pointed out that "there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order. There is, the Board says, no per se rule that the commission of any unfair practice will automatically result in a § 8(a) (5) violation and the issuance of an order to bargain." 395 U.S. at 615, 89 S. Ct. at 1940.

In order to be one of the second category of cases in which enforcement of a bargaining order on the basis of card authorizations is proper, the Board must

find, on a record which supports the finding, that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." The beginning point is a finding that the union once had majority status but that that status was dissipated by extensive employer misconduct and that the employer misconduct, because of past pervasiveness, the likelihood of its recurrence, or both, would adversely affect a future election.

We conclude that this case falls into the second category. The card count shows that the union had signed authorizations from 17 out of 30 employees. Interest in representation by a union remained high until Kane's illegal anti-union campaign took effect, and then interest declined precipitously. Kane attacks this apparent majority on the grounds that the cards were ambiguous and misleading on their face, that they had been obtained by misrepresentations and that the activities of the supervisor, who signed two cards not included in the 17, tainted the remainder of the cards. We find substantial support for the Board's resolution of these issues against Kane. The cards were a simple statement that the employee authorizes the union "to represent me in all matters of collective bargaining with my employer"—the very form held to be a valid expression of employee choice in *Gissel*. And there was creditable testimony that the purpose and effect of the card was adequately explained to the employees. While the supervisor twice signed cards for herself, attended some union meetings, asked one employee if he were going to a union meeting and transported several other employees to union meetings, her participation in union activities was minimal. The actual solicitation of cards was by the union organizer, and the cards were signed in the latter's presence. Moreover, the supervisor's status and influence over the employees had been recently impaired because an employee that she had discharged had been reinstated, and Kane had announced to the other employees that her authority to discharge them had been withdrawn.

Kane's repeated violations of § 8(a)(1) were so frequent and of such a nature as to support the conclusion that they could not be sufficiently erased so as reasonably to insure a future fair election. We start from the proposition that in the Sinclair Company v. N. L. R. B. and *General Steel* cases, decided as a part of *Gissel*, § 8(a)(1) violations alone, without any violation of § 8(a)(3), may be sufficient to support a bargaining order. In the instant case the violations were repeated. They were more than technical violations of § 8(a)(1); they included clear and unmistakable threats of discharge and other reprisals by the owner-employer to a substantial percentage of unskilled and unsophisticated employees of a small collective bargaining unit. The speaker, clearly having the economic power to do his will, manifested his views sufficiently so that they were known to all. We cannot say that the Board either lacked substantial evidentiary support or exceeded its discretion in concluding to order Kane to bargain on the previously signed card authorizations rather than to order an election preceded by affirmative steps to redress past violations.

Enforcement granted.