**SHULMAN'S, INC., OF NORFOLK,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 74–1167.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 7, 1975.

Decided June 27, 1975.

Arthur J. Kowitt, Chicago, Ill. (Michael F. Rosenblum, Mayer, Brown & Platt, Chicago, Ill., H. Thomas Fennell, Jr., Byron P. Kloeppel, Cooper, Davis, Kilgore, Parker, Leon & Fennell, Portsmouth, Va., and Charles L. Stewart, Jr., Chicago, Ill., on brief), for petitioner.

Robert G. Sewell, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick H. Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel,

and Madge F. Jefferson, Atty., N. L. R. B., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and RUSSELL, Circuit Judge.

ALBERT V. BRYAN, Senior Circuit Judge:

The National Labor Relations Board order, issued on January 29, 1974, requiring Shulman's, Inc., of Norfolk, Virginia, to bargain with the Retail Store Employees Union, Local 233, AFL–CIO, is here attacked as invalid by the employer, while its enforcement is pressed by the Board. The snarl is that the Board's order was entered notwithstanding the employees in an election had rejected the Union.[1]

The Union's organization campaign was commenced December 20, 1972. A representation petition was filed January 2, 1973. Although the Union asserted that by virtue of a card check it represented a majority of the employees, the Union and the employer stipulated for a consent election to be held March 5. This agreement was approved by the Regional Director on February 2. Accordingly, the election was held but the tally showed that the Union had lost by 27 to 33, with four votes challenged.

With the Chairman dissenting, the Board found that the Company had committed unfair labor practices forbidden under § 8(a)(1) of the Act by: offering better wages and terms of employment to employees to urge them to vote against the Union; coercively interrogating employees and informing them that others were no longer seeking a Union; soliciting employee grievances; and sending a letter on the day of the election to the employees bearing a promise of benefits. Additionally, the Board found that the Company had broken the provisions of § 8(a)(5) by declining to recognize and bargain with the Union although it had a card majority.

On these premises the Board set aside the election and rated the conduct of the Company as so pervasively hostile to the Union that another election could not be fairly held. It was then the Company was directed to recognize and bargain with the Union. Fundamentally the Company contends that these findings were without substantial evidence upholding them, but at all events they did not warrant the bargaining order. The following elucidation of the findings manifests and explicates the Company's position. At the same time it makes starkly plain that the Board gave absolutely no permissible reason for concluding that a rerun election would not have a great likelihood of being a fair expression of employee sentiment.

(a) The first of these unfair labor practices—offering of better wages and employment terms—is said to consist of the allowance of holiday pay to hourly-paid employees for holidays on and after January 1, 1973. The Company explains that it was added compensation to meet competition. This decision had been made by the Company in August 1972, before the appearance of the Union, but for business policy it was thought best not to announce it until January. The Board found that the increase in pay was originally planned to go into effect on February 1, and that the acceleration of the effectiveness was purposed to sway the electors to the Company's side. There was testimony by the president and controller of Shulman's that the planned date for the increase had always been January 1. Clearly, the payment on January 1 had no greater influence on the March 5 election than the increase would have had if it had been paid on February 1, except that the pay for New Year's Day would not have been made to the employees involved.[2]

---

1. The Act—and its sections cited herein—is the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. Reference to the findings of the Board is intended to include those of the Administrative Law Judge accepted by the Board.

2. There is contradictory testimony as to how many hourly employees qualified for the January 1 holiday pay. Various witnesses said that ten, six and four employees were included.

In August 1972, Shulman's, also for competitive considerations, had decided to add certain fringe benefits for the tailor shop employees effective February 1, 1973. Instead, the Company granted the raises on March 6 and March 9, immediately after the March 5 election. While the Board disagreed with the Administrative Law Judge's determination that the grant of post-election extras could be relied upon for setting aside the election, it did consider the increases "with respect to whether or not the atmosphere for holding a fair rerun election has been destroyed so as to necessitate a bargaining order," and accorded that force to the added allowances. The key consideration here is that the determination to enhance the benefits was a fact before the Union was even in sight and not a contrivance in anticipation of use in an organization campaign. Indeed, the delay appears to have been a good faith effort by Shulman's to avoid interference with the election.

(b) The Board found that R. L. Mayo, the manager of one of the two Shulman's stores in Norfolk, had told three employees that certain others of them no longer espoused the Union; it found that such assurances were advanced to induce them to discontinue Union sponsorship. Mayo, the Board is sure, had held out promises of benefit to two of these employees as a means of dampening Union sympathy. It equated Mayo's conduct to interference, restraint, or coercion of employees' rights, trespasses upon § 8(a)(1).

But this is not the full story of Mayo's activities. Unrefuted evidence proves Mayo had from the beginning instigated and fostered the Union campaign. With outside political ambitions, he wooed Union endorsement and political assistance as well as money contributions. With these entreaties and solicitations rebuffed, his Union enthusiasm soured, and he became as intent upon defeating its organization as he had earlier pressed his affection. The anti-union activities imputed to him by the Board and charged to the Company as unfair labor practices were all staged after his change of heart.[3]

His doubleness of allegiance was by then well known generally among the employees. Consequently, it would seem that his unpredictable conversions would hardly contaminate the climate of a second election. It is worthwhile to note that Mayo had talked with only three employees and, according to the Administrative Law Judge, two of them testified that his statements had no effect upon them at the time of the election. Above all, Mayo soon left (May 23, 1973) the employ of Shulman's, shattering whatever efficacy remained of his past promises and threats.

(c) The Board also felt that a meeting arranged by some of Shulman's officers with five of its 69 employees in a motel room on March 1 was a misdoing under § 8(a)(1), particularly since Shulman's had not previously made a practice of inviting employee complaints. The opportunity for such a meeting was tendered to all employees at the end of the Company's first campaign gatherings on February 27. The Board underscored the fact that two of the employees on that occasion had discussed pay raises and promotions promised them by Mayo. Chairman Miller sized up the incident simply as the officers' becoming aware of Mayo's pledges and seeing the meeting as a chance to clear the air. Recall of Mayo's departure from the Company

---

**3.** N.L.R.B. Chairman Miller on Mayo is tart:

"Respondent here was confronted with a member of management who apparently was primarily interested in his own political future and acted out of what he perceived to be his own self-interest, rather than as an authorized management agent. He first did his best to attract employee support for the Union and then, after the Union failed to support his political efforts with either a $2,500 contribution or with an endorsement of his candidacy, his attitude changed by 180 degrees and he engaged in a series of acts and statements which unlawfully interfered with employees' freedom of choice, this time in an effort to destroy support for the Union which had, as he saw it, let him down." 208 NLRB 117 (1974) (dissenting opinion).

presumably would defuse the Board fear of any impact of the meeting on a second election.

(d) Finally, on election day, Shulman's distributed a letter to its employees. The Board read the letter as a covert foretelling of better things to come. Truth is it was simply an innocuous request of support as its words openly imparted:

"Employees of Shulman's:

We are anxious to work more closely with you on a person-to-person basis. We recognize the problems that exist within our organization, we are making every effort to correct them, and with your help we will! We sincerely solicit your vote, and we ask that you cast a 'no' ballot today."

■ (e) Union possession of a card majority does not by itself entitle it to a bargaining order. There must also be employer conduct embracing such unfair labor practices as would destroy the feasibility of a later election. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 614, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Peerless of America, Inc. v. N.L.R.B., 484 F.2d 1108, 1115 (7 Cir. 1973).

■ Our view is, furthermore, that even if the accused incidents amounted to unfair labor practices, they did not justify so stern a step as the imposition of the bargaining order. Dissection and evaluation of the episodes is convincing that none was a serious offense to the Act. The *apparent* gravity of the conduct is at once dissipated, and its actuality as only a minimal violation is plainly revealed, by the conspicuous absence of any suggestion of infliction of damaging consequences, such as undermining of the prospect of a second and fair election. This, too, was the judgment of the dissenting Board Chairman; he believed the remedy to be "a fresh election".

The formula for gauging unfair practices as calling for a bargaining order

after a ballot rejection of the Union is written in N.L.R.B. v. Gissel Packing Company, 395 U.S. 575, 614, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), supra. For this ascertainment the Court would balance the potency of the unfair labor practices vis-a-vis the Union card majority. If the breaches of the Act ceased or their virility was spent, so that their influence did not extend into the period of a reelection, a bargaining order was without place. The Court's words were these:

" * * * If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is *slight* and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. [Footnote omitted.]

"We emphasize that under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, *because of their minimal impact* on the election machinery, would not sustain a bargaining order. There is, the Board says, no *per se* rule that the commission of any unfair practice will automatically result in a § 8(a)(5) violation and the issuance of an order to bargain." Id. 614–615, 89 S.Ct. 1940. (Accents added.) [Footnote omitted.]

In our assessment, the result of the assumed violations of the Act here was not so permanent or pervasive as to infuse union hostility into a subsequent campaign.

With violations of greater weight than the present ones, and despite the Union's holding of a card majority, Peerless of America, Inc. v. N.L.R.B., supra, 484 F.2d 1108 (7 Cir. 1973), disallowed them as justifying a bargaining order.[4] The

4. The alleged breaches there were summarized as follows:
"The facts show that, as soon as the Union began to organize, Respondent began to under-

mine the Union. Thus Respondent [1] systematically polled union sentiment, [2] created the impression of union surveillance and [3] directed a supervisor in the presence of an em-

Court was of opinion that dictation of a bargaining order on so insubstantial infractions is "a wholly unnecessary encroachment on *employee* free choice . . . and that the concededly superior election process should take its course." Id. 1122. (Accent added).

*Peerless* diligently parsed and tracked the pronouncements of *Gissel*. On that scale the violations in *Peerless* (though of more body than those here) were wanting in weight to demand a bargaining order, the Seventh Circuit stating:

> "We conclude on analysis of the simple facts involved that we would be abdicating our judicial function and shirking our responsibilities if we ever enforced a bargaining order in this case.

.    .    .    .    .

> "The sustainable Section 8(a)(1) violations involved here were *only marginally so.* That is, the reasonable capability of the interrogations, threats, promise of benefits and solicitations to induce a fear of reprisal or expectation of benefits was a very close question, resolved in favor of the Board only deferentially by viewing the incidents as parts of a course of conduct. But because they might reasonably be thought to induce such fear or expectation hardly means the employees involved were actually coerced or that their voting sentiments would be affected." Id. 1120. (Accent added.)

Still adhering to *Gissel,* the Court reiterated the elements indispensable to the adoption of a bargaining order:

ployee to segregate a union supporter, [4] repeatedly interrogated employees about their own and others' union sympathies and about attendance at a union meeting, [5] made repeated efforts to have an employee persuade others to give up their support of the Union, [6] promised a change for the better in working conditions, [7] threatened worsened working conditions, and [8] threatened a plant shutdown and layoff—all in discouragement of un-

" . . . whether or not the Company violated Section 8(a)(5) likewise depends upon whether the Union had a valid card majority when it made its demand *and* upon whether the Company engaged in ' "contemporaneous unfair labor practices likely to destroy the union's majority status and seriously impede the election." ' " Id. 1115. (Accent added.)

Thus it is reaffirmed that to justify such an order, assuming a card majority existent, there must be conduct potentially impairing the Union's majority. As now already evident, no such behaviour was here chargeable to the Company.

Additionally and with equal force, N.L.R.B. v. World Carpets of New York, Inc., 463 F.2d 57, 62 (2 Cir. 1972), declared:

> "Although we realize that *Gissel* placed great discretion in the Board to decide when the employer's misconduct so jeopardizes the chances of a free election that a bargaining order must issue, we will not automatically defer to the Board's decision when, as here, the employer's misconduct is *minimal* and the Board's opinion not only is based on faulty premises but is devoid of any analysis as to why, in this particular case, a fair election was no longer possible." (Accent added.)

To repeat, as we do not account the allegedly unfair labor practices of the Company as rising to the level of imminent or future threat to the process of collective bargaining and warranting a bargaining order, we decline to enforce the order.

Order not enforced.

ion support. These unfair labor practices were directed at undermining union strength and impeding the election process. Applying the standards of N.L.R.B. v. Gissel Packing Co., [395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547], we consider whether there is still a possibility of ensuring a fair election. . . . " [Footnotes omitted.] *Peerless,* 484 F.2d 1108, 1111 (7 Cir. 1973).