NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

APPLETREE CHEVROLET, INC., Respondent,

Sheet Metal Workers' International Association, Local 66, AFL–CIO, Intervenor.

No. 78–1780.

United States Court of Appeals, Fourth Circuit.

Argued July 11, 1979.

Decided Nov. 1, 1979.

Sara McLaurin Green, N. L. R. B. (John
S. Irving, Gen. Counsel, John E. Higgins,

Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John H. Ferguson, Washington, D. C., on brief), for petitioner.

Asa Ambrister (George V. Gardner, Gardner, Ambrister & Smith, Washington, D. C., on brief), for respondent.

Raymond J. Sweeney, Toledo, Ohio, for intervenor.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

The National Labor Relations Board has petitioned for enforcement of its order in a consolidated proceeding involving a complaint of unfair labor practices under 8(a)(1) and 8(a)(3) and (1) of the National Labor Relations Act and a representation proceeding under 8(a)(5) of that Act. (29 U.S.C. 151, et seq.)[1] We enforce in part and remand in part the order of the Board.

The respondent operates a Chevrolet dealership in Asheville, North Carolina. In connection with that business, it maintains a service department, a parts department, and a body shop. The bargaining unit involved consists of the employees in these three departments, who number between 45 and 51 employees. The Union's[2] organizational efforts among these employees began with a meeting on January 6, 1977. It thereafter undertook actively to solicit authorization cards from the employees. On January 24, 1977, it advised the respondent by letter that 31 of the latter's employees in the relevant departments had signed authorization cards in favor of the Union and it requested "the Company [to] honor the rights guaranteed to employees under Section 7 * * *," in favor of these employees.

The complaint alleges that a few days before the receipt of the letter advising the respondent that the Union had secured authorization cards from a majority of the employees, the respondent undertook a series of acts intended to interfere with its employees' rights under the Act in violation of Section 8(a)(1). These alleged acts consisted of the solicitation of employees' grievances, the announcement of increased retirement and other employment benefits, threatening and coercive interrogation of employees, and, finally, the discharge of five employees in violation of 8(a)(3). After all this alleged misconduct on the part of the respondent had concluded, an election among the employees was held on February 25, 1977, under the Board's procedure to determine whether the employees wished to have the Union as its bargaining agent. At this election, a number of challenges were made, primarily by the respondent. The election resulted in 23 votes cast for the Union, 17 votes against it, with 17 votes challenged and uncounted. Hearing on these challenges was then consolidated with the hearing on the 8(a)(1) and 8(a)(3) alleged violations. After the consolidated hearing was concluded in August 1977, the administrative law judge filed his report.

The administrative law judge disposed of the unfair labor practice charges by finding that the respondent had violated 8(a)(1) of the Act in the particulars charged and 8(a)(3) by discharging four employees.[3] He concluded, on the basis of these findings, that the respondent should be ordered to bargain with the Union as "the majority representative of all employees in the appropriate unit from and after January 20, 1977, the date on which the Respondent first demonstrated to employees that it had embarked on an unlawful course of conduct." In connection with the representation proceedings, the administrative law judge resolved the various vote challenges

1. The Board's Order, dated August 25, 1978, is reported at 237 NLRB No. 103.

2. The Union involved is Sheet Metal Workers International Association, Local 66, AFL–CIO.

3. The original charge involved the discharge of five employees. However, the administrative law judge found the charge as it related to one of these employees unproved and the Board affirmed.

entered at the representation election. After resolving the challenges, the administrative law judge recommended in this phase of the proceeding that the ballots of those employees who, although their right to vote had been challenged, were found qualified to vote, should be "opened, counted and that a revised tally of ballots issue," that if "the revised tally of ballots show[ed] that a majority of votes has been cast for the Union, then the Regional Director for Region 11 shall issue a certification of representative," but if "a majority [of] votes has not been cast for the Union, then the election shall be set aside, the Petition in Case No. 11–RC–4300 dismissed and all prior proceedings thereunder vacated."

The respondent excepted to the report of the administrative law judge both on his findings of 8(a)(1) and 8(a)(3) violations and on the challenges of the election. The Board, however, affirmed the "rulings, findings, and conclusions" of the administrative law judge and adopted his recommended order save in one particular. The administrative law judge had sustained the respondent's challenge of the ballots of three janitors working in the departments whose employees were within the stipulated bargaining unit. The Board disagreed with this conclusion of the administrative law judge and ordered the ballots of the three janitors counted in tallying the votes in the representation election.

The Board has petitioned this Court to enforce its consolidated order in the two proceedings. We enforce in part, deny in part, and delay in part enforcement. We find substantial evidence to support the Board's findings of violations of 8(a)(1) by the respondent. However, we do not find the evidence in the record sufficient to support the Board's findings of discriminatory discharges in violation of 8(a)(3). Neither did the Board have a sufficient factual basis for the issuance of a bargaining order. Finally, we find the resolutions of the challenges to votes at the representation election on February 25 by the Board fully supported by substantial evidence. In summary, we enforce the Board's cease and desist orders relating to the respondent's

8(a)(1) violations and uphold its decision on the challenged votes at the representation election, but we refuse to enforce the Board's order of reinstatement of employees Emory Gilley, David Bartlett, Pearson Junior Baines, and David Gillespie, and we remand the order providing for a bargaining order for consideration in the light of the results of the representation election.

We consider first the respondent's objections to the 8(a)(3) charge. The General Counsel charged that "these four employees were signaled out for discharge because of their specific union activity, especially their statements at the Moseley meetings." It was the respondent's position, on the other hand, that the parties discharged were the least productive employees in their respective departments and that they had been discharged in an effort to improve the productivity and efficiency of the departments. The administrative law judge found specifically that these employees "were not discharged because of statements made at the Moseley meetings" or "because of particular union activity," as the General Counsel had charged in his complaint. He also, found that the employees discharged "were among the least productive" in the two departments concerned, that "the Respondent certainly might discharge low producers," and that a discharge "in order to improve service department efficiency," which was the reason advanced by the respondent for the discharges, was "certainly [a] respectable" ground for discharge. On the basis of these findings the administrative law judge found that the respondent had what he described as "supportable" grounds for discharging these employees. These findings of the administrative law judge, affirmed by the Board, amounted, in effect, to a dismissal of the Board's charge of discriminatory discharges of these four employees.

Despite these specific findings against the charges of discriminatory discharges as alleged in the General Counsel's complaint, the administrative law judge went on to find that the employees' discharge violated the Act on a ground not raised by the

General Counsel. The rationale for such a finding was unique under the circumstances. The administrative law judge, to quote his exact language, concluded, after finding that the General Counsel had not proved his claim of discriminatory discharge, "that the Respondent made a determination to discharge a group of employees in order to discourage the union activity generally," and then undertook to pick particular employees against whom some "supportable cause [for discharge] could be made." He then reasoned from this determination that the "supportable cause" for discharge was "pretextual" and that the dominant, motivating purpose of the discharges was to discourage union activity. In essence, what the administrative law judge concluded was that, even though these four employees were clearly unsatisfactory employees with the ·lowest productivity in their departments and even though their conduct had not been marked by any particular union activity, the respondent had discharged them, not for the reason given, which the administrative law judge found to be both "respectable" and "supportable," but in order thereby to frighten the other employees, whose productivity records did not place them in the same situation as these four and for whom there was no "supportable cause" for discharge, save possibly their Union prominence, into abandoning the Union.

■ In advancing this theory that the "supportable cause" for the discharges was not the real, but only the "pretextual" reason for the discharges, the administrative law judge was confronted with the well-settled rule that when an employer has a "supportable cause" for discharging an employee involved in an 8(a)(3) claim—as both the administrative law judge and the Board found there was—the burden shifts to the Board to find and identify "an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one," that is, why he rejected the "supportable" cause and "chose a cause intended to discourage union activity." [4] And this burden cannot be sustained by evidence that rises no higher than conjecture or suspicion. *Firestone Tire & Rubber Co. v. N. L. R. B., supra,* 539 F.2d at 1337. The administrative law judge seems to have recognized this obligation and sought to satisfy that burden.

■ In his effort to sustain this burden, the administrative law judge offers no really plausible reason why the discharge of a mere four employees, whose particular union affiliation or activity had no connection with their discharges, could be calculated to discourage union activity, especially when there was a reasonable or "supportable" basis for those discharges, as found by the administrative law judge and as manifestly known to the other employees. If, of course, the dischargees had been particularly active in the union campaign, an inference of improper motivation may have been

---

4. *American Mfg. Assocs., Inc. v. N. L. R. B.* (4th Cir. 1979) 594 F.2d 30, 36; *Firestone Tire & Rubber Co. v. N. L. R. B.* (4th Cir. 1978) 583 F.2d 1268, 1273; *Firestone Tire & Rubber Co. v. N. L. R. B.* (4th Cir. 1976) 539 F.2d 1335, 1337; *N. L. R. B. v. Patrick Plaza Dodge, Inc.* (4th Cir. 1975) 522 F.2d 804, 807; *N. L. R. B. v. Consolidated Diesel Elec. Co.* (4th Cir. 1972) 469 F.2d 1016, 1024–28; *Maphis Chapman Corp. v. N. L. R. B.* (4th Cir. 1966) 368 F.2d 298, 304; *N. L. R. B. v. Covington Motor Co.* (4th Cir. 1965) 344 F.2d 136, 138; *Hazel-Atlas Glass Co. v. N. L. R. B.* (4th Cir. 1942) 127 F.2d 109, 114–117; *Waterbury Community Antenna, Inc. v. N. L. R. B.* (2d Cir. 1978) 587 F.2d 90, 96–99; *Western Exterminator Co. v. N. L. R. B.* (9th Cir. 1977) 565 F.2d 1114, 1118; *Famet, Inc. v. N. L. R. B.* (9th Cir. 1974) 490 F.2d 293, 296.

In *Waterbury Community Antenna, Inc. v. N. L. R. B.* the Court, after an exhaustive review of the authorities, states the issue that arises in an N. L. R. B. case when the employer has a valid reason for the termination of the employee's services as follows:

"The issue before us, therefore, is whether there is substantial evidence in the record considered as a whole to support the Board's conclusion that Tabaka would not have been discharged but for his union activities." *Id.* at 99.

In *Western Exterminator Co. v. N. L. R. B., supra,* the Court said (p. 1118):

" * * * '[w]here a party has two motives, one permissible and the other impermissible, the better rule is * * * that the improper motive must be shown to have been the dominant one.'"

appropriate. There are an infinite number of precedents where a determination of discriminatory discharge has been sustained under such circumstances. But it is difficult to find any basis for assuming that a discharge for a proper cause of a few employees out of a much larger force, even during a union campaign,[5] warrants such an inference in the absence of any particular union activity or prominence on the part of the dischargees.

The Board has sought to fortify the administrative law judge's unusual finding of discriminatory discharge in this case by citing *Majestic Molded Products, Inc. v. N. L. R. B.* (2d Cir. 1964) 330 F.2d 603 and *M. S. P. Industries, Inc. v. N. L. R. B.* (10th Cir. 1977) 568 F.2d 166, as authority supporting the administrative law judge's determination. Neither case, however, is at all analogous to this case or can provide authority for the determination made. In *Majestic Molded Products, Inc. v. N. L. R. B.,* the employer was faced with an effort by a new union to organize its employees and to replace an existing union bargaining agent in one of its plants. A representative of the older union, after being rebuffed by the employees in his effort to induce the employees to abandon their petitions in favor of the new union, threatened that he was going to advise the employer to close down the plant and transfer the work over to a plant where the older union was the bargaining agent. The next day the employer began laying off employees and within 2 days had laid off approximately 90 per cent of the employees in the plant, thereby giving countenance to the threat. A few days later ¾ths of the employees disassociated themselves from the new union. There

could have been little doubt in such case of the motivation or of impact, or that the action of the employer, manifestly induced by the other union, was a "power play" intended to discourage affiliation with the new union.

*M. S. P. Industries, Inc. v. N. L. R. B.* is equally distinguishable. In both written letters to and in oral exhortation of employees, intended to encourage employees to vote against the union at an approaching union election, the employer boasted that it had never had a layoff and assured the employees there would never be a layoff at its plant. When, however, the Union won the election, the employer, in obvious pique and with the plain purpose of showing its spiteful reaction, immediately began layoffs. Again, the purpose of the layoffs was clear.

No circumstances such as existed in the two cited cases, can however, be instanced here. There was nothing to connect directly the discharges with discouragement of the Union campaign, as in *Majestic Molded,* or with an obvious intention to retaliate against Union members as in *M. S. P.* In *Majestic Molded* and in *M. S. P.* there was absolutely no justification for the layoff, other than to discourage Union affiliation by the employees. Here, on the other hand, the Board has found that there was a "supportable cause" for the challenged discharges. This case accordingly presents an entirely different question than that confronted by the Board in *Majestic Molded* and *M. S. P.* and one that requires a different rationale from that adopted in *Majestic Molded* and *M. S. P.,* if the claim of discriminatory discharge is to be sustained in this

---

5. It is well settled that the mere fact that an employee—even a union activist—was discharged during a union campaign, standing alone, will not support a discriminatory finding if there is a "supportable cause" for the discharge. *Wellington Mill Division, West Point Mfg. Co. v. N. L. R. B.* (4th Cir. 1964) 330 F.2d 579, 586, *cert. denied,* 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88; *Federal-Mogul Corp. v. N. L. R. B.* (5th Cir. 1978) 566 F.2d 1245, 1259; *Iowa Beef Processors, Inc. v. N. L. R. B.* (8th Cir. 1977) 567 F.2d 791, 799. In *Federal-Mogul,* the Court said:

"The burden of proof in a case such as this [*i. e.,* where there is 'supportable' cause for discharge] is upon the General Counsel and requires that he present substantial evidence that the discharge came from improper motives * * *. Furthermore, mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not lightly to be inferred * * *. The employer does not have the burden of disproving the existence of unlawful motivation in discharging an employee * * *."

case. The administrative law judge in effect seeks to do this by impugning the good faith and reasonableness in what he had earlier found was a "respectable" and "supportable cause" for discharge and to draw from this a basis for a finding of illegal discharge.

■ The administrative law judge's attack on the discharges is, accordingly, not that the discharges were not for good cause, but that they were pretextual because (1) there was no warrant for discharging at the time for inefficiency in the service departments since the efficiency was then improving, (2) the dischargees were actually "competent employees" whose level of productivity was about that of most other employees in the department, and finally (3) the employer had never warned the dischargees of their deficiency in productiveness. No one of these grounds seems to us to have substantial support in the record. It may be that there was some increase in productivity in the service department in the last part of 1976, as the administrative law judge stated, but, and this is the important circumstance, there was no suggestion anywhere in the record that these four dischargees were in any way responsible for this increase or that their individual productivity had improved any at all over this period. Actually, it is inferable that their low productivity was one of the factors preventing further improvement in overall productivity. Neither can it be fairly said that the record gives any support for the finding by the administrative law judge that the productivity of the dischargees was about on a level with that of other employees in the service department, the ground on which the administrative law judge apparently rests primarily his pretextual finding; in fact, the record is conclusively to the contrary. Thus, in the truck service shop the employee with the lowest productivity was Baines, one of the four dischargees ordered reemployed by the Board. In the automobile service department, the lowest four

producers were Gilley, Cordell, Gillespie, and Gurley. Their scores varied from 71 for Gilley down to 54 for Gurley. The average in the department was in excess of 88 and the leader had a score of 166. All four of these low producers in this department were discharged.[6] Contrary to the statement of the administrative law judge, the evidence does not support accordingly any finding that the production level of the employees discharged, including both these two that the Board found properly discharged and the two it found improperly discharged, was "about the same" as that of the other employees in their departments.

The final reason that the administrative law judge cited as reflecting adversely on the good faith of the discharges was that, other than Gillespie, none of those discharged had been warned of his low productivity. Presumably, however, these employees did not have to be told by the respondent of their low productivity. They unquestionably knew they were at the bottom of the ladder in efficiency. Employees in that condition, especially when their employer is engaged in a program of improving productivity, could not have been surprised that they were discharged. And certainly the other employees would not have been surprised.

■ We are accordingly left with nothing but conjecture to sustain the critical assumption that the respondent selected for discharge four employees whose only prominence as employees was their low productivity in order to frighten other employees from supporting the Union. To warrant this assumption, it would be necessary to relate their discharges to some fact or circumstance that would indicate that they would not have been discharged but for the coercive effect their discharge would have had on other employees. When the administrative law judge made the twin findings, adopted by the Board, that the discharges of these employees were for a valid "supportable cause" and were not for any "par-

---

**6.** It is noteworthy that the discharges of two of these employees is not challenged by the Board on this appeal as improper.

ticular union activity" on their part, he removed any basis for such a finding. We accordingly refuse to enforce that part of the Board's order that requires the reinstatement, with back pay, of Emory Gilley, David Bartlett, Pearson Junior Baines and David Gillespie.

We likewise refuse to enforce the Board's issuance of a bargaining order in this case. In *NLRB v. Gissel Packing Co.* (1969) 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the Court identified three categories of cases,[7] in only two of which is a bargaining order permissible. The first of these consists of those " 'exceptional' " cases marked by " 'outrageous' " and " 'pervasive' " unfair labor practices of " 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.' " *Gissel* at 613–14, 89 S.Ct. at 1940. In this classification of cases, a bargaining order may issue even though the Union may not be able to prove it ever had a majority status among employees. The second category—and the one with which we are concerned—[8] is represented by "less extraordinary cases marked by less pervasive practices." The essential justification for a bargaining order in

this latter category of cases, as stated in *Gissel*, depends on findings (1) that the Union once had a majority status, (2) that such status had been dissipated by pervasive misconduct on the part of the employer, (3) "that the possibility of erasing the effects of [these] past [pervasive] practices and of ensuring a fair election [or a fair rerun] by the use of traditional remedies, though present, is slight" and (4) "that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940; *N.L.R.B. v. Kane* (4th Cir. 1970) 435 F.2d 1203, 1207; *N.L.R.B. v. American Cable Systems, Inc.* (5th Cir. 1969) 414 F.2d 661, 668–69, *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970).[9] It is also to be borne in mind as a condition to the exercise of this extraordinary power that an election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent for employees. It is only because the misconduct of the employer has so dissipated the union majority that a fair expression of employee sentiment, uncoerced by the employer's improper conduct, cannot be secured by the traditional procedure that, in this second class of cases, a bargaining order may issue.[10] It is thus

---

7. One court has characterized the classification under *Gissel* as the positing of "a tripartite categorization of unfair labor practices for considering the issuance of bargaining orders without requiring elections." *N.L.R.B. v. Armcor Industries, Inc.* (3d Cir. 1976) 535 F.2d 239, 244.

8. The Board stated that, while it was "unnecessary to determine whether Respondent's conduct comes within the first or second category of unfair labor practices defined by the Supreme Court in *N.L.R.B. v. Gissel Packing Co., Inc.*, 395 U.S. 575 [89 S.Ct. 1918, 23 L.Ed.2d 547] (1969), as a bargaining order is warranted under either finding," it analyzed the facts of the case as one falling within the second category. We conclude that this is the proper categorization for this case, and, as did the Board, we analyze the circumstances of the case under the rules for a bargaining order in a case of the second category.

9. In *American Cable*, the Court said:
"Under the *Gissel* holding a bargaining order may issue where: (a) the union had valid authorization cards from a majority of the employees in an appropriate bargaining unit;

(b) the employer's unfair labor practices, although not 'outrageous' and 'pervasive' enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) 'the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight'; and (d) employee sentiment can best be protected in the particular case by a bargaining order. * * * "

10. *N.L.R.B. v. Pilgrim Foods, Inc.* (1st Cir. 1979) 591 F.2d 110, 120; *N.L.R.B. v. Craw* (3d Cir. 1977) 565 F.2d 1267, 1272.
In *Pilgrim* the Court said:
"In *NLRB v. Cott Corp.*, 578 F.2d 892, 894–95 (1st Cir. 1978), while passing on a question involving successor employers, we acknowledged that the Supreme Court in *NLRB v. Gissel Packing Co., supra*, 395 U.S. at 602, 89 S.Ct. 1918, made it clear that an election remains the preferred method to determine a bargaining unit's representative and that a bargaining order should be enforced only when an election is not feasible.

not sufficient that an employer has engaged in unfair labor practices; a bargaining order in this second category requires the Board to go beyond a finding of such unfair labor practices and to "make 'specific findings' as to the immediate and residual impact of the unfair labor practices on the election process;" that is, the Board "must make 'a detailed analysis' assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, and the potential effectiveness of ordinary remedies.' " *N.L.R.B. v. Armcor Industries, Inc., supra*, 535 F.2d at 244; *Shulman's, Inc. of Norfolk v. N.L.R.B.* (4th Cir. 1975) 519 F.2d 498, 501; *General Steel Products, Inc. v. N.L.R.B.* (4th Cir. 1971) 445 F.2d 1350, 1354;[11] *N.L.R.B. v. Pacific Southwest Airlines* (9th Cir. 1977) 550 F.2d 1148, 1152; *Peerless of America, Inc. v. N.L.R.B.* (7th Cir. 1973) 484 F.2d 1108, 1118.[12]

■ The administrative law judge, in his recommendation of a bargaining order,

based his conclusion on his assessment that the acts of the respondent "were pervasive and egregious unfair labor practices. Thus the Respondent should be ordered to bargain with the Union as the majority representative of all employees in the appropriate unit from and after January 20, 1977, the date on which the Respondent first demonstrated to employees that it had embarked on an unlawful course of conduct." He made no findings of the "residual impact" of those practices, "the likelihood of recurring misconduct" on the respondent's part, or "the potential effect of ordinary remedies," such as the issuance of an 8(a)(1) order.[13] The administrative law judge apparently assumed that by merely repeating the magic words "pervasive and egregious" and by simply engaging in "perfunctory or 'boiler-plate,' " language, or using " 'a litany, reciting conclusions by rote without factual explication,' "[14] he had met the criteria

---

There have been no concrete reasons given by the Board as to why a fair election is not now feasible."
In *Craw* the Court said:
"First, it must be recalled that the affirmative relief provided by a bargaining order is not a traditional remedy under federal labor law. It is appropriate, as the Supreme Court stressed in *Gissel*, only in cases in which the unfair labor practices are so 'outrageous' and 'pervasive' that their coercive effects could not be eliminated by customary remedies; or in which 'less pervasive' practices 'nonetheless still have the tendency to undermine majority strength and impede the election processes.' The rationale undergirding the *Armcor* ruling is that because these effects must exist in order for the bargaining order to be an appropriate remedy, the Board should be required to explain with specificity the results of the unfair labor practices and, in particular, the unlikelihood of a fair election."

11. For the full history of this proceeding, *see General Steel Products v. N.L.R.B.*, 503 F.2d 896 at 897, *cert. denied*, 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975)

12. In *N.L.R.B. v. Pacific Southwest Airlines*, the Court said:
"Effective appellate review, as well as judicial and administrative accountability, requires that the Board clearly articulate the reasons behind any order, and particularly why other remedies were found to be inappropriate."

In *Armcor Industries, Inc.*, the Court said: "The Board therefore must make 'specific findings' as to the impact of the unfair labor practices on the election process and clearly explicate the basis for its decision to issue a bargaining order." (p. 245)

13. In *Peerless of America, Inc. v. N.L.R.B., supra*, 484 F.2d at 1121, the Court said:
"The entry of the Section 8(a)(1) cease and desist order and notice we are sanctioning will itself be of considerable significance in connection with a possible fair election for two reasons. First, the order will provide added protection against the likelihood of the recurrence of misconduct, and second, the posting of the order finding the Company guilty of unfair labor practices will almost certainly have a favorable impact on the Union's chances for success in the election."
In *First Lakewood Assocs. v. N.L.R.B.* (7th Cir. 1978) 582 F.2d 416, 424, the Court said:
"The § 8(a)(1) violations in this case did not, in our opinion, have a significant impact on employee voting sentiments, and any initial impact will have dissipated prior to the next election, especially if the Board's ordinary remedies of a cease and desist order and a posted notice intervene."

14. *See N.L.R.B. v. Pacific Southwest Airlines*, 550 F.2d at 1152; *N.L.R.B. v. General Stencils, Inc.* (2d Cir. 1971) 438 F.2d 894 at 901, *on remand enforcement denied*, 472 F.2d 170 (2 Cir. 1972).

established by *Gissel.* This is manifestly insufficient to meet the test for a bargaining order. *Hedstrom Co. v. N.L.R.B.* (3d Cir. 1977) 558 F.2d 1137, 1150–52.[15] To approve such a procedure would be to approve in effect the automatic issuance of bargaining orders in any case where the Board declared the misconduct of the employer to be "pervasive and egregious." Such a procedure would not accord with the standards declared in *Gissel* and *General Steel Products, Inc. v. N.L.R.B.* And the Board seemed to recognize this, for it attempted in its order to bolster the administrative law judge's recommendation by adding some analysis and findings in support of the bargaining order.[16]

The primary reason assigned by the Board for a bargaining order was the finding of discriminatory discharges. It assumed that these discharges were "because of union activity" on the part of the dischargees. The Board overlooked the findings of the administrative law judge, affirmed by it, to the contrary. This, however, is unimportant in view of our conclusion, as stated earlier, that the discharges were not violative of the Act and cannot, therefore, provide authority for a bargaining order. This leaves as the only basis for the bargaining order (1) the solicitation of grievances of employees during the Union campaign by a psychologist employed by the respondent, (2) the announcement of certain improved benefits to employees during the same period, and (3) threatening interrogations of "employees regarding their union sympathies." We find that these grounds—all involving simple 8(a)(1) violations—do not provide an adequate showing for a bargaining order in the absence of any credible findings that there is any "likelihood that the employer's misconduct will recur" or that the residual impact of these practices is sufficient to make the

likelihood of a fair election scanty, if not impossible, despite the prophylactic effect of a cease and desist order.[17]

The first ground stated by the administrative law judge was the solicitation of grievances from the employees by a psychologist employed by the respondent. However, there was nothing threatening about this solicitation nor is there the slightest suggestion in the record that any employee was influenced to alter his support of the Union by the inquiry of the psychologist. Unlike the employees in *Majestic Molded* there is no evidence that a single employee changed his authorization card because of this conduct of the respondent. During the solicitation there was never a reference to the Union. Under these circumstances it would be difficult to find that the solicitation had any adverse impact on the fairness of a subsequent election, and this is perhaps the reason the administrative law judge made no effort to find such impact.

The promise of benefits to the employees—the second fact mentioned by the Board—concerned a contribution to the employees' profit-sharing plan by the employer, certain changes in vacation and holiday pay, and bonus plans. The profit-sharing plan to which the respondent made its contribution was not something that evolved during the Union campaign in 1977. The respondent had inaugurated the plan in 1974 with a contribution from profits for the year 1973. It is true that it had not made a contribution to the plan out of profits for 1974 or 1975. Whether this was because 1974 and 1975 were years marked generally by deflation in the automobile trade is not developed in the record. However, in December 1976, before the Union began its efforts to organize the respondent's employees, the directors of the re-

---

**15.** *See N.L.R.B. v. Pilgrim Foods, Inc.,* 591 F.2d 119:

"Although the language glows with Supreme Court sanctioned terms, the Board failed to go beyond semantics and give specific examples and precise reasons for this extreme remedy."

**16.** The Board noted that the Union had not charged an 8(a)(5) violation. There was such a violation charged in the complaint, and this was found sufficient to present the issue.

**17.** *First Lakewood Assocs. v. N. L. R. B.,* 582 F.2d at 424.

spondent approved a contribution from profits in 1976 to the plan. What the administrative law judge found improper in this contribution was not that the respondent made the contribution. That was consistent with respondent's earlier action in inaugurating the plan. What he found objectionable was the timing of the announcement of such contribution in early February 1977, in the midst of the Union campaign. The respondent also announced certain changes in vacation and holiday pay and bonuses for increases in sales of certain parts. There was nothing apparently unusual in any of this: the respondent did this generally two or three times each year. Again, the evil in the action, as perceived by the administrative law judge, was the timing in these particular instances during the Union campaign. We, however, declared in *Louisburg Sportswear Company v. N. L. R. B.* (4 Cir. 1972) 462 F.2d 380 at 384:

"Wage increases during union organizing campaigns are not forbidden, unless the increase is granted and announced for the purpose of restraining employees in the free exercise of their right of choice. Such a purpose is negated if it can be shown that the announcement is consistent with established company practice, or was planned and settled upon before the organizing campaign began. The evidence here meets the criteria for validity of the wage increase."

Again, in *Delchamps, Inc. v. N. L. R. B.* (5th Cir. 1979) 588 F.2d 476 at 479, the Court said that "a wage increase made during a union organizational campaign is not forbidden unless it is granted for the purpose of restraining employees in the free exercise of their right of choice of whether to unionize."

There are several factors that must be considered in determining whether the gratuitous benefits were intended "to restrain employees in the free exercise of their right of choice." The timing of the grants of benefits is certainly a factor and an important factor to be considered. But there are others to be considered. In *Louisburg* we referred to whether the benefit was "settled upon before the organizing campaign began." *Delchamps* identifies "the relation of the wage increase to past practices" as another factor. All of these factors are involved here. The change in holiday, vacation, and promotion benefits was announced during the Union campaign. It was not unusual, however; such changes apparently followed "past practices" of making such changes two and three times a year. The contribution to the employee benefit plan, too, was announced during the Union campaign. But it had been authorized before the Union entered on its campaign. Of course, the administrative law judge considered all these factors and concluded that the timing of the benefits rendered them coercive under the circumstances. We have accepted that finding as supported by the record. But we emphasized the other factors because these are factors that, though passed over in resolving the 8(a)(1) issues, must be weighed in resolving whether the misconduct was such as to have a coercive effect rendering impossible a fair election sufficiently to support a bargaining order. As we have seen, this determination is the critical one in the determination of whether a *Gissel* bargaining order should issue, since it is the impact of the violation on the likelihood of an uncoerced election, and not the violation *per se,* that is important in that connection.

Finally, the Board refers to threatening interrogations of employees "regarding their union sympathies." In making this claim the Board is relying on the fact that on one occasion the manager of the respondent "said something to the effect * * * that the employees should not get their names on the 'wrong list'." While the manager denied making any such statement, the administrative law judge credited the contrary testimony. He did find the language, if expressed, was ambiguous, but he gave it the aspect of "an implied threat should they support the Union." While this inference is not entirely clear to us, we accepted it for purposes of reviewing the 8(a)(1) violation. The other language, found objectionable by the administrative law judge and to which apparently the

Board referred, was an inquiry of two employees about who among the employees were for the Union and who against it as well as a request that one of those spoken to would "do some 'politicking' for the Company."

The serious omission in both the Board's and the administrative law judge's conclusion that a bargaining order was appropriate was, as we have already observed, the failure to make anything more than the most cursory findings on the impact of the 8(a)(1) violations on the possibility of a fair election. Both seem to have proceeded upon the erroneous assumption that a finding of unfair labor practices automatically engendered a coercive atmosphere that would support a bargaining order. They take no account of the fact that a bargaining order is warranted only if the unfair labor practices found rise "to the level of imminent or future threat to the process of collective bargaining * * *." [18] And, to make these findings, the Board must, as we have seen, assess "the possibility of holding a fair election in terms of any continuing effect of misconduct, and the potential effectiveness of ordinary remedies," [19] should consider whether the respondent's conduct has dissipated the Union's majority and whether the employer is likely to "ignore the Board's cease and desist order." [20] A

bargaining order is not punitive in purpose; it is purely remedial. [21]

*Gissel* makes it clear both in its statement of the question being reviewed and in the circumstances of each case reviewed that it is the unlikelihood of a fair election which is the critical issue in determining whether the remedy of a bargaining order is permissible. The issue, as stated by the Court in that case was "whether a bargaining order [was] an appropriate and authorized remedy where an employer rejects a card majority while at the same time committing unfair practices that tend to undermine the Union's majority and make a fair election an unlikely possibility * *." [22] There seemed little question that in the several cases reviewed in *Gissel* there was a dissipation of the previous Union majority and that was the really significant fact in each case. Thus, in one of the cases, the Union did not seek an election because the employer's misconduct had completely dissipated the Union's support (*Gissel*), in a second, the Union petitioned for an election but did not press it because again it had clearly lost its support as a result of alleged misconduct (*Heck's, Inc.*), and, in the other two cases, (*General Steel* and *Sinclair*) the Union had lost the subsequent representation election. [23] In this case, however, there is no contention that the prior Union majority had been dissipated by the respondent's

18. *Shulman's, Inc. of Norfolk v. N. L. R. B.*, 519 F.2d at 502.

19. *N. L. R. B. v. Armcor Industries, Inc.*, 535 F.2d at 244.

20. *First Lakewood Assocs. v. N. L. R. B.*, 582 F.2d at 424. *See also Peerless of America, Inc. v. N. L. R. B.*, 484 F.2d at 1121:
 "The entry of the Section 8(a)(1) cease and desist order and notice we are sanctioning will itself be of considerable significance in connection with a possible fair election for two reasons. First, the order will provide added protection against the likelihood of the recurrence of misconduct, and second, the posting of the order finding the Company guilty of unfair labor practices will almost certainly have a favorable impact on the Union's chances for success in the election." We also referred to the same point in *Shulman's, Inc. of Norfolk v. N. L. R. B.*, 519 F.2d at 501:

 "If the breaches of the Act ceased or their virility was spent so that their influence did not extend into the period of a reelection, a bargaining order was out of place." *See also First Lakewood Assocs. v. N. L. R. B.*, 582 F.2d at 424, the Court said:
 "The § 8(a)(1) violations in this case did not, in our opinion, have a significant impact on employee voting sentiments, and any initial impact will have dissipated prior to the next election, especially if the Board's ordinary remedies of a cease and desist order and a posted notice intervene."

21. *Bandag, Inc. v. N. L. R. B.* (5th Cir. 1978) 583 F.2d 765, 773.

22. 395 U.S. at 579, 89 S.Ct. at 1922.

23. Pettibone, *The Sec. 10(j) Bargaining Order in Gissel-Type Cases*, 27 Lab.L.J. 648, 652 (1976).

misconduct. Unlike the unions in *Gissel* and *Heck's,* the Union here did not withdraw its petition for an election because it knew its prior majority status had been dissipated; it continued to press for an election and we assume it did so because it assumed its membership had not been dissipated. And unlike the situation in *General Steel* and *Sinclair,* the Union had not lost the election; actually it had received a substantial majority of the unchallenged votes, and, if the challenged votes are distributed between the Union and the opposition in accordance with the percentages each received in unchallenged votes (which is the general procedure by election prognosticators in political elections), the Union's share of the vote is a clear majority, with its votes exceeding the number of authorization cards it had procured from the employer when it requested representation on January 24 and before the respondent had committed any of the unfair labor practices charged by the General Counsel. This circumstance emphasizes that there is not any reasonable basis for finding that any misconduct of the respondent had made "a fair election an unlikely possibility." *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. at 579, 89 S.Ct. at 1922; *Shulman's, Inc. of Norfolk v. N. L. R. B.,* 519 F.2d at 502; *N. L. R. B. v. Lloyd Wood Coal Co., Inc.* (5th Cir. 1978) 585 F.2d 752, 757.

 Moreover, the Board apparently had misgivings about the propriety of a *Gissel* bargaining order in this case. If it had been satisfied that such an order was proper, it would have been unnecessary for it to have reviewed the challenges to the election held or to have ordered the votes in the election tabulated. Normally, it would be expected that the Board would have deferred the consideration of the propriety of a bargaining order until after the result of the election had been ascertained. In any event, we will defer consideration of the propriety of a bargaining order in this case until the result of the election has been determined. The proceedings are accordingly remanded to the Board to complete the tallying of votes in the representation proceeding and for the determination of the

result, without prejudice to the right of the Board to reverse its request for enforcement of the bargaining order provision in its order or to the right of the respondent to resist such an order, should the Union not prevail in the election.