401 F.2d 434
 130 U.S.App.D.C. 369
 UNITED STEELWORKERS OF AMERICA, AFL-CIO, LOCAL 5571, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Stanley-Artex
Windows, Division of the Stanley Works, Intervenor.
STANLEY-ARTEX WINDOWS, DIVISION OF the STANLEY WORKS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, United
Steelworkers of America, AFL-CIO, Local 5571, Intervenor.
 Nos. 21193, 21343.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 8, 1968.
Decided Sept. 3, 1968.
 
 Mr. George H. Cohen, Washington, D.C., with whom Messrs. Elliot Bredhoff and Michael H. Gottesman, Washington, D.C., were on the brief, for petitioner in No. 21,193 and intervenor in No. 21,343.
 Mr. Glenn L. Greene, Jr., with whom Mr. W. Reynolds Allen, Goldsboro, N.C., was on the brief, for petitioner in No. 21,343 and intervenor in No. 21,193.
 Mr. Elliott Moore, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Thomas S. Smith, Atty., National Labor Relations Board, were on the brief, for respondent.
 Before BASTIAN, Senior Circuit Judge, and BURGER and MCGOWAN, Circuit judges.
 BURGER, Circuit Judge:
 
 
 1
 Both the Union and the Company petition for review of a finding by the National Labor Relations Board that the Company violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. 158(a)(1), (a)(5) (1964), by failing to furnish requested economic data to the Union, and violated sections 8(a)(1) and 8(a)(3), 29 U.S.C. 158(a)(1), (a)(3) (1964), by refusing to grant immediate and full reinstatement to striking workers.
 
 
 2
 The Company first argues that it was not under a duty to produce its financial statements because there was no claim of financial inability to pay. Twice during the period of collective bargaining the Company wrote directly to its employees. The first letter stated:
 
 
 3
 Our sales have increased very substantially as you well know from the many hours of overtime and the many new employees. Each of you, who work on an hourly basis, have had a larger take-home pay than ever before. However, increased sales do not necessarily mean increased profits or earnings. Earnings are what is left after expenses are paid. Unfortunately, our cost of doing business has increased alarmingly, resulting in earnings not in proportion to our sales increases. Material costs have increased and we have also spent large sums in improving our working conditions by bringing the property and equipment to a better appearance and operating condition. Later, the Company wrote: To give you a little background, you will recall in previous letters I had mentioned to you that 1964 had been a very trying and difficult year. Even though our sales were higher, our earnings were considerably less than the year before.
 
 
 4
 In response to the Union's initial request for the Company's financial statements, made after the first letter to the Company's employees, the Company furnished the statements of its parent company, but not of the division with which the Union was bargaining. The Company told the Union that it was not the policy of the parent company to release such information. However, the Company negotiator later stated that although the parent was making money, the division was not, and the division had to stand on its own. When the Union made its wage proposals, the Company's negotiator responded, according to his own testimony, that 'if we gave any more, at this time, I didn't see how we could remain competitive.' The Board concluded that the Company throughout relied upon its inability to afford the economic demands and that its position had, by the end of the negotiations, 'crystallized into a claim of inability to pay more than it was offering and remain competitive.' We agree that the contention that the division had to 'stand on its own' and that it could not remain competitive if it granted Union demands put ability to pay in issue.
 
 
 5
 If a claim of inability to pay 'is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.' NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). Not only was the claim that profits were not proportionate to increased sales apparently made to the Union here, but the Company also took its case directly to the workers-- the ultimate arbiters of contract proposals. When the final wage offers were exchanged, the Company returned to its claim that the money to pay for the Union's proposal just wasn't there.[1]
 
 
 6
 The Company asserts that a claim of inability to pay is not shown when the Company merely claims that the increases will prevent it from competing. But the inability to compete is merely the explanation of the reason why the Company could not afford an economic benefit. In Truitt, for instance, the case from which the short-hand expression 'inability to pay' is derived, the employer's claim was that 'an increase of more than 2 1/2 cents per hour would put it out of business.' 351 U.S. at 150, 76 S.Ct. at 754. Claims of the need to remain 'competitive' have been equated to claims of inability to pay for the purposes of creating an obligation to provide supporting economic data. E.g., International Tel. & Tel. v. NLRB, 382 F.2d 366, 370-371 (3d Cir. 1967); NLRB v. Celotex Corp., 364 F.2d 552 (5th Cir.), cert. denied, 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450 (1966); NLRB v. Western Wirebound Box Co., 356 F.2d 88, 91 (9th Cir. 1966).
 
 
 7
 The Company's second challenge to the Board's order is that, even if it did violate section 8(a)(5) by failing to furnish the requested financial statements, the subsequent strike was nevertheless an economic strike, and not an unfair labor practice strike. The significance of this contention is that only if the strike were an unfair labor practice strike could the Board order reinstatement and back pay for certain strikers for whom replacements were hired. See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).
 
 
 8
 The Company urges that the strike was an economic strike because its motive was to exact a larger wage settlement. But the existence of economic motives for a strike does not preclude its being an unfair labor practice strike. See NLRB v. My Store, Inc., 345 F.2d 494 (7th Cir. 1965); NLRB v. Southland Cork Co., 342 F.2d 702 (4th Cir. 1965); General Drivers Local 662 v. NLRB, 112 U.S.App.D.C. 323, 302 F.2d 908 (1962); NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 269 (2d Cir. 1963). The question is whether the unfair labor practice was a 'principal cause of the strike.' NLRB v. Southern Cork Co., supra, at 707.
 
 
 9
 The negotiations between the Company and the Union had reached a stalemate on only one issue-- wages. The record here reveals that the Company had represented to the Union-- and had informed the employees directly-- that its operations were not producing a return that would justify the requested wage increase. In response, the Union requested access to the Company's financial information so that it could adequately evaluate the feasibility of pursuing the wage demand. The Company refused, and the employees were informed of this fact among others by their negotiator when he reported to the employees before they acted on the proposals and voted to strike. The company action of refusing to submit financial data was found by the Board to constitute an unfair labor practice, as representing tactics which disrupted the bargaining session to the point of impasse. Thereafter, the employees rejected the Company's offer and voted to strike. The Board concluded that the wage stalemate led to the strike and that the failure to furnish financial information brought on this stalemate. Our review, limited to whether there is record support for this conclusion, leads us to conclude we are bound to affirm the Board's action.
 
 
 10
 The Company also challenges the Board's order because the record lacks specific evidence as to which workers were denied reinstatement, and which were reinstated and then discharged.[2] Because of the incomplete state of the record,[3] the Board decided to defer until the compliance proceedings, the determination of such matters as which employees were entitled to reinstatement and the dates on which others were tardily offered reinstatement.[4] There is record evidence to support the finding of the Board that certain strikers were reinstated and then laid off wneh the swollen labor force was reduced. While there is no absolute obligation to discharge replacements when unfair labor practice strikers are reinstated, the replacements must make way for reinstated strikers. See Mastro Plastic Corp. v. NLRB, supra. Consequently, if an employer causes his labor force to become overextended by retaining replacement workers, and then reduces that labor force to normal size by laying off both strikers and replacements, he has done the same violence to the rights of unfair labor practice strikers as if he denied them reinstatement. The Company here offered no evidence to support its assertion that the lay-offs were due to decline in business. Instead, testimony of Company officials shows that the reinstatement on top of retained replacements caused the Company's labor force to exceed what it would normally be at that time. Since there is record evidence to support the findings of the Board as to the improper reinstatement of the unfair labor practice strikers, we find no error in deferring until the compliance stage of these proceedings a determination of which employees were entitled to what relief.
 
 
 11
 The Union challenges the Board's order for the failure to find additional section 8(a)(1) and 8(a)(5) violations. The first asserted violation was that the Company unilaterally changed working conditions, see NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), when it provided free food and beverages for those workers who did not strike. For the first eight days of the strike the normal canteen-truck food service was not available to the workers because the regular suppliers of food service would not cross the picket lines. For this limited period, the Company paid for sandwiches and coffee brought into the plant in a private automobile. Thereafter, regular canteen-truck services were established. The Board was plainly justified in finding no unfair labor practice; this was a small matter resulting from 'circumstances which the Board could or should accept as excusing or justifying unilateral action.' NLRB v. Katz, supra, at 748, 82 S.Ct. at 1114.
 
 
 12
 The Union also challenges the Board's dismissal of unfair labor practice charges against the Company for conditioning its bargaining on the Union's dropping pending unfair labor practice charges. See NLRB v. Southland Cork Co., 342 F.2d 702, 706 (4th Cir. 1965); Hartsell Mills Co. v. NLRB,111 F.2d 291, 292 (4th Cir. 1940). The only evidence that the Company so conditioned its bargaining was that a negotiator stated that he 'couldn't think clearly with these charges hanging over his head.' Although it was about a month between this statement and the next bargaining session, there is no evidence here of a refusal to bargain while the charges were pending, as there was in the cited cases. See also Solo Cup Co. v. NLRB, 332 F.2d 447 (4th Cir. 1964).
 
 
 13
 The Union also challenges the Board's order for failing to require back pay for reinstated workers from the time they were replaced, rather than from the traditional time used here-- the time of the offer to return to work. E.g., NLRB v. Southland Cork Co., supra. The Company, on the other hand, urges that the Board should have tolled the back-pay provisions until the date of its order. The Board entered its traditional order for this type of case. However, as this court has said before:
 
 
 14
 The Board's power to fashion remedies places a premium upon agency expertise and experience, and the board discretion involved is for the agency and not the court to exercise. We cannot insist that the traditional relief provided here will be so ineffective to enforce the policies of the Act as to be insufficient as a matter of law.
 
 
 15
 Amalgamated Clothing Workers v. NLRB, 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966). For the same reason, the Union's contentions that the order should have required the Company to mail a notice to each employee is lacking in merit.
 
 
 16
 The Company's petition for review in Case Nos. 21,343 and the Union's petition for review in Case No. 21,193 are denied and the Board's order will be enforced.
 
 
 17
 So ordered.
 
 
 
 [1]
 The Company also claims that, even if it did assert an inability to pay for the increased economic benefits, the Union had not previously asked for a wage increase. However, the first Company letter to the employees came after the Union had initiated the bargaining with a series of economic demands. 166 N.L.R.B. No. 110. Moreover, when the Union first presented its specific wage demands, the Company negotiator, by his own admission, responded that the Company could not meet these demands and still remain competitive. The Union thereafter again requested the financial statements and they were not provided. Even on the Company's reading of Truitt, then, the record shows a wage demand, followed by a claim of inability to pay, and then a refusal to furnish supporting economic data requested by the Union
 
 
 [2]
 The Company fully replaced the striking employees and it did not discharge any of the replacements when the strikers were reinstated. However, about one month later, the parent company ordered lay-offs of part of the swollen labor force. Some of the reinstated strikers were then laid off and the Board concluded they were thereby denied their reinstatement rights
 
 
 [3]
 The Trial Examiner did not reach these matters because he had concluded that the strike was an economic strike
 
 
 [4]
 The record contains letters from the Company denying reinstatement to certain workers alleged to have engaged in strike misconduct. However, this claim was subsequently dropped by the Company; before the Board, it contended only that the strike was economic and therefore the strikers were not entitled to reinstatement