**ELECTRICAL PRODUCTS DIVISION OF MIDLAND–ROSS CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–2556.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1980.

Decided March 18, 1980.

Joseph A. Oertel, Atty. (argued), John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

George V. Gardner (argued), Asa Ambrister, Gardner, Ambrister & Smith, Washington, D. C., for petitioner.

Before SEITZ, Chief Judge, and ADAMS and WEIS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

The Electrical Products Division of Midland-Ross Corp. (the employer) petitions for review of an order of the National Labor Relations Board that adopted the administrative law judge's (ALJ) finding of numerous labor violations arising out of events at two of the employer's plants in Pennsylvania. The Board has filed a cross application for enforcement of its order.

### I. *Factual Background*

In 1974, the employer bought two plants in Pennsylvania as part of a single transac-

tion: the Del-Val plant in Tullytown and the Nylomatic plant in Morrisville. The two plants are about seven miles apart, and both are engaged in the production of plastic goods utilizing molds supplied by customers. There was some integration of the two facilities, especially at the upper management levels.[1] In addition, records for both plants were stored at Nylomatic.

Nevertheless, the plants were not exactly similar. For example, the Nylomatic plant was non-unionized. At Del-Val there were two unions representing separate bargaining units: the United Glass & Ceramics Workers (Ceramics Workers) representing the production and maintenance employees, and the International Union of Tool, Die & Mold Makers (Tool Makers) representing the tool room employees. Moreover, from the time of the acquisition, the Nylomatic plant was profitable, but Del-Val was not. Although a consulting firm recommended in December 1974 that the employer divest itself of Del-Val, the plant remained open and members of the management made optimistic statements about its financial status during 1975.

The events with which the unfair labor practice proceeding was concerned took place in 1976. In January of that year, the employer assigned George Bickerstaff, one of its vice presidents, the responsibility for studying Del-Val's financial posture. He discussed various options with company officials, including closing Del-Val. In February, he formed a task force of top officials to study the employer's options as to Del-Val.

Sometime shortly after the formation of this task force, the Ceramics Workers began an organizational campaign at the Nylomatic plant. On March 1, the union sent out a letter and authorization cards to all Nylomatic employees. By March 10, the union informed the employer it had cards from a majority of all Nylomatic employees. On March 11, it forwarded 32 authorization cards to the regional director and filed an election petition. On March 25, the Tool Makers filed a representation petition seeking to represent some of the Nylomatic employees covered by the Ceramics Workers' petition.

During April, the task force studying Del-Val handed in its report. The report was pessimistic, and Louis Zharadnik, the employer's controller, began preparing a Project Appropriations Request (PAR), an analysis of the economic impact of plant closure. On June 4, he completed the PAR, recommending closure of the Del-Val plant.

On June 10, the regional director ordered an election to be held on July 1 at the Nylomatic plant. He defined two units: Unit A, covering production and maintenance employees, and Unit B, which covered the tool room employees. The election in Unit A only concerned the Ceramics Workers, but both the Ceramics Workers and the Tool Makers wanted to be the representative for Unit B.

On June 17, a vice president of the company informed vice president Bickerstaff of the decision to close Del-Val. The following day, Bickerstaff told Robert Worth, the operations manager for both Nylomatic and Del-Val, to start closing down Del-Val.

Early in the morning of June 22, Nicholas Phillips, the labor relations manager of the employer, met with representatives of the Ceramics Workers and the Tool Makers to inform them of the decision to close Del-Val. When asked for a time table for the closing, Phillips said one had not yet been set. William Kline, a representative of the international of the Ceramics Workers, asked what could be done to help the employees. Kline replied: "There is nothing the [unions] can do." Later that day, Phillips met with the morning and afternoon shifts at Del-Val to announce the closing. Also on June 22, Worth posted notices at both Nylomatic and Del-Val announcing the closing.

---

1. The record indicates that the following positions covered both facilities: operations manager, sales manager, quality control manager, purchasing manager, tool manager, and personnel manager.

The following day, June 23, Phillips again came to Del-Val to inform employees of the closing. At that time, outside the hearing of other employees, Phillips, Kline, and Long (the president of the Ceramics Workers local) met together. Kline said to Phillips that the Del-Val closing would affect the Nylomatic election set for July 1. Long testified that Phillips stated in response: "Yes it will. It will definitely have something to do with the vote."

The same day, Worth, who managed both plants, sent out a letter to all Nylomatic employees. After a brief opening paragraph, the letter continued:

Yesterday I announced the decision by Midland-Ross to phase out the operations at the Del-Val plant. In 1975 Del-Val lost in excess of $500,000 and the trend has not improved. For the first five months of this year it has lost in excess of $240,000. While I personally regret this action, it will enable your management to concentrate solely on the survival of the Nylomatic operation.

The next four paragraphs continued by describing the financial condition of Nylomatic and Worth's hopes that it would continue in its profitable activity. The letter then concluded:

On July 1, 1976, you will be asked to exercise your right to vote for the Company or to vote for a third party to represent you. I urge you to give this decision your sincere, careful consideration. If you vote for the Company, we will continue to be able to resolve any problems that may come up without a third party coming between us.

Your management does not want a third party in the plant because a third party may create complex working conditions, we may have to hire unnecessary workers and we may have work stoppages, strikes or slowdowns. All of these have a negative effect on the profitability of our plant. Your all know that you don't need a third party to continue getting good treatment at this plant.

Even if you signed a card you still have a right to vote "NO" in a secret ballot election. . . .

NO TO DUES

NO TO STRIKES

NO TO VIOLENCE

NO TO THE ENCOURAGEMENT OF DISTRUST BETWEEN US

If we are to succeed in making Nylomatic a sound, profitable business which will give you security, we don't need the presence of a union—we need the utmost in trust, cooperation, and the spirit which you have exhibited in the past.

Sincerely yours,

Robert R. Worth

Operations Manager

June 29, two days before the election, Worth, Phillips, and sales manager Cal Engel spoke to the Nylomatic employees at three meetings, making the same remarks at each. Worth opened the meeting by announcing that Del-Val had been closed because it had become unprofitable. Phillips then told the employees that if they rejected the unions, they would profit when the plant profited. Finally, Engel explained that if the plant was organized, strikes would delay delivery of orders, and "a union would hurt the business."

June 30, Phillips met with representatives of the Ceramics Workers and the Tool Makers to discuss the Del-Val closing. When asked when the plant would close, Phillips replied that it would shut down for vacation on July 1 for two weeks, but he was unsure how many employees would be needed or for how long after vacation. After discussing insurance and vacation benefits, Phillips gave Kline of the Ceramics Workers a severance pay schedule. Kline disagreed with the proposal, and Phillips told him the employer's proposal was "not bargainable; that's it. That's from the higherups."

July 1 saw the occurrence of two events. First, Del-Val closed for vacation and never reopened.[2] Second, at Nylomatic, the Ceramics Workers lost the election in Unit A,

2. Although some of the work, employees, and equipment at Del-Val was transferred to Nylomatic, there is no contention here that the closing constituted a runaway shop.

and the Tool Makers won the election in Unit B.

On July 6, the Ceramics Workers filed objections to the elections in both Units A and B. The same day, that union filed an unfair labor practice charge relating to the closing of Del-Val and its effect on the election. On July 7, the employer filed objections to the election in Unit B.

On August 4, Phillips and George Gardner, the employer's attorney, met with Kline and Long to discuss the effects of the closing. Phillips presented Kline with a proposed agreement that included the same severance pay schedule as that at the June 30 meeting. The agreement also recited that the "negotiations were conducted on a good faith basis." Kline objected to the good faith clause on the ground that it would prejudice the Ceramics Workers' pending unfair labor practice charge. An argument ensued, and Kline walked out of the meeting. Kline and Phillips later exchanged letters, but no more meetings were held.

On October 15, the elections in both Units A and B were set aside. The Ceramics Workers then filed a second unfair labor practice charge requesting a bargaining order as to Unit A. This was consolidated with the earlier charge and a hearing was held.

The ALJ found a variety of unfair labor practices: (1) the employer violated §§ 8(a)(5) & (1) of the National Labor Relations Act by failing to bargain with the Ceramics Workers over the decision to close Del-Val; (2) the employer violated §§ 8(a)(5) & (1) for not bargaining in good faith over the effects of the closing; (3) the employer violated § 8(a)(1) by impliedly threatening the Nylomatic employees that it would close the plant if they voted for the unions; (4) the employer violated §§ 8(a)(3) & (1) by timing and implementing the closing of Del-Val in such a manner as to chill union activity at Nylomatic; and (5) the employer violated §§ 8(a)(5) & (1) by refusing to bargain with the Ceramics Workers as the collective bargaining representative of Unit A at Nylomatic. In addi-

tion to a cease and desist order, the ALJ established preferential hiring lists and back pay for the Nylomatic employees and ordered the employer to bargain with the Ceramics Workers as to Unit A at Nylomatic. The Board adopted the ALJ's opinion with minor changes, and this appeal followed.

## II. Findings of Unfair Labor Practices

### A. Bargaining About the Closing of Del-Val

■ In *Brockway Motor Trucks v. NLRB*, 582 F.2d 720 (3d Cir. 1978), we established a framework for analyzing an employer's duty to bargain over the decision to close a plant in cases of a partial closing. Even where the employer's reason for closing is economic, "there is an initial presumption . . . that a partial closing is a mandatory subject of bargaining." *Id.* at 735. A balancing approach then is applied to determine whether a duty to bargain existed in a particular case, weighing the union's interest in protecting its members' livelihood against the employer's interest in implementing its economic decision with minimal interference or financial loss.

■ Here, we note that bargaining would have vindicated the union's interest. Even if the Ceramics Workers could not have helped to keep Del-Val open, it could have at least tried to make suggestions that would minimize the closing's effect on the employees, such as transfer of work, minimizing customer withdrawals, and so forth. *See id.* at 736.

By contrast, there is no suggestion that bargaining with the union would have hampered the employer's decision to close in any way. In *Brockway*, we refused to enforce the order because the economic considerations underlying the employer's decision were not in the record. Here, we have that reason: the unprofitability of the Del-Val plant. Yet there is nothing in all the evidence that Del-Val was so unprofitable that the employer had to close immediately without consulting the union. Indeed, the employer's conduct belies such a contention. Starting in January 1976, Bickerstaff spent

over a month studying the problem. The task force then spent three months, and then the officer writing the PAR almost another two months. The employer has offered no reason why the union could not have been notified at some point during this period. Indeed, the evidence shows that from January to June the employer considered many of the options that *Brockway* says the union can be helpful with. Nor is there any evidence that bargaining with the union would have harmed the employer's negotiations with some third party. *See id.* at 738–39.

In *Brockway*, we noted that if the closing was forced by a third party outside the employer's control, that might justify not bargaining with the union. The employer points out that most of its customers withdrew their orders after learning of the closing. Although withdrawal of orders might justify not bargaining in some situations, such is not the case here. The customers did not begin to withdraw orders until *after* the June 22 meeting at which the employer notified the union of its final, irrevocable decision. Thus customer withdrawals do not excuse the failure to involve the union between January and June 22. Because none of the economic factors present here overcomes the presumption in favor of the duty to bargain, we hold that the employer had a duty to bargain over its decision to close Del-Val.

■ Having found that a duty to bargain existed, we turn to the evidence relied on to support the finding that the duty was violated. We note initially that our scope of review as to factual findings is narrow: we may only reverse if the Board's finding is not supported by substantial evidence. It is for the Board to draw inferences and assess credibility, and we may not substitute our assessment of the evidence for the Board's if there are conflicting versions in the rec-

ord. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Here, there was ample evidence to support the ALJ's findings. Both Kline, the international representative, and Long, the local president, testified that the June 22 meeting was the first time either learned that the situation at Del-Val was so bad as to require closing.[3] Phillips, the employer's labor management relations manager, would not give a time table nor did he ask for suggestions, conduct in which he persisted at the June 30 meeting.

Thus Phillips presented the union with a fait accompli and prevented it from participating in implementation of the timing of the closing, two of the situations the *Brockway* rule is designed to prevent. Accordingly, we hold that there was substantial evidence to support the finding that the employer violated its duty to bargain over the decision to close Del-Val.

### B. Bargaining Over the Effects of the Closing

■ In addition to the duty to bargain over the decision to close, an employer has a duty to bargain over the effects of that closing on the employees. *See Brockway, supra,* at 736 & n. 91; *NLRB v. Royal Plating & Polishing Co.,* 350 F.2d 191, 196 (3d Cir. 1965). Here, there was substantial evidence that the employer did not bargain in good faith.

Kline, the international representative of the Ceramics Workers, testified that on June 30, Phillips told him that the company's proposal on severance pay was not bargainable. The company presented the same proposal on August 4, along with a clause to the effect that the employer had bargained in good faith, which Kline read as an attempt to force the union to abandon its unfair labor practice charge. *Cf. United*

---

**3.** The employer argues that Kline was aware of Del-Val's difficulty because there had been statements at bargaining sessions in previous years that Del-Val was having some problems. The ALJ could properly credit Kline and Long's statements for two reasons. First, there is no evidence that the statements indicated that the

situation was so bad as to require a closing. Second, Kline, who had been involved in negotiations with other employers, testified that employers often alleged economic troubles as a bargaining lever and that such statements never meant to him that the employer would have to close.

*Steel Workers of America v. NLRB*, 130 U.S.App.D.C. 369, 373, 401 F.2d 434, 438 (D.C.Cir. 1968) (it is an unfair labor practice to condition bargaining on the dropping of unfair labor practice charges), *cert. denied*, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969). Long, who was present at both meetings, supported Kline's version. Finally, although the union wrote to the employer about further negotiations, the employer continued the request that the union sign the August 4 proposed agreement.

All of the employer's arguments on this point are not responsive to our scope of review. For example, it contends that Phillips's testimony contradicts that of Kline as to the June 22 meeting in that Phillips denied refusing to bargain and that he thought Kline was joking about severance pay. As to the August 4 meeting, the employer says that the presence of its lawyer indicates a willingness to bargain but that Kline "stormed out." Yet Kline testified that he felt that Phillips questioned his credibility, which was the reason he left. The ALJ believed the testimony of Kline and Long over that of the employer's witnesses,[4] and as we have already noted, determinations of credibility are for the Board.

■ Because the testimony of the union's witnesses supports the ALJ's finding, we affirm the finding of a violation for failing to bargain in good faith over the effect of the closing of Del-Val.

C. *Implied Threats of Closing Nylomatic*

■ We have held that a threat to close a plant if the union wins the election may be an unfair labor practice. *E. g., NLRB v. Juniata Packing Co.*, 464 F.2d 153, 156 (3d Cir. 1972). The particular danger to be avoided is predictions not based on objective facts that tend to undermine the employees' ability to make a free choice. We have noted in this regard:

However, language may *imply* a threat as well as constitute a threat directly, and the problem of drawing the line between a prediction and an implied threat is often one of great difficulty. As the economic dependence of employees on their employer may cause them to be particularly sensitive to nuances in language which would be lost on a neutral observer, the possibility that a statement contains an implied threat must be viewed from the employee's point of view. For that reason the expertise of the Board is particularly relevant to the determination of whether a latent threat lies hidden in the words of an employer. Our scope of review is limited to inquiry as to whether the Board's determination is reasonable and supported by substantial evidence. *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 9–10 (3d Cir. 1969) (footnotes omitted).

Here, the ALJ found that three statements of the employer contained implied threats of closing Nylomatic: the notice posted at Nylomatic on June 22, the letter sent out by Worth, the operations manager, on June 23, and the meetings held by three company officials with employees on June 29.

Viewed from the employee's perspective the message was unmistakable. The June 23 letter starts out by saying that Del-Val (seven miles away and unionized) was being shut down because it had become unprofitable. The letter ends by saying that a union victory would make Nylomatic unprofitable. There is no objective reason given for this other than some rather vague generalizations about strikes and violence. Indeed, the preceding paragraphs explain how profitable Nylomatic had been. The hidden connection between the opening and the closing, which few employees could miss, was that unionization of Nylomatic would lead to the same result as it had at Del-Val: unprofitability and subsequent closing.

---

4. One of the counsel who represented the employer at the hearing testified as to the August 4 meeting. This put the ALJ in the unfortunate position of evaluating the credibility of one of the advocates before him. We note that such a situation should be avoided. ABA Code of Professional Responsibility EC 5–9, 5–10.

The June 29 meeting followed the same pattern: Worth stating that Del-Val was being closed because it was unprofitable and Engel, the sales manager, warning that the union would hurt business at Nylomatic. Finally, the notices reinforced the message by their omnipresent reminder.

The employer offers two justifications for these activities. First, it claims it had to notify its landlord by June 30 that it would not renew its lease at Del-Val after December 31, 1976. The employer contends it did not want the employees to learn of the closing through rumors if it told the landlord. Although the employer did present testimony that the landlord was a local politician who might leak the news, the ALJ expressly discredited the testimony and found there was no danger that the landlord would tell anyone. Moreover, the record shows that the employer did not tell the landlord until June 30, the day before the election, and all the employer's conduct complained of by the union occurred prior to that date. Because the notice to the landlord was actually given right before the election and after the complained of conduct and because the ALJ found there was no likelihood that the landlord would leak the information in such a short space of time, the Board was justified in concluding that the employer's argument was without merit.

Second, the employer says it posted the notices at Nylomatic because some employees worked at both plants. In the first place, this does not explain why the employer in addition sent out the letter and held meetings that involved all Nylomatic employees, even those who did not work at Del-Val. Moreover, given the ALJ's finding that the landlord would not tell anyone about the closing, the employer has offered absolutely no reason why anyone other than the landlord had to know about Del-Val prior to July 1.

We conclude that the finding of implied threats to close Nylomatic was supported by substantial evidence.

## D. Closing of Del-Val

In *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the Supreme Court held that although an employer may close an entire operation, it may not close one plant to chill unionism at another of its facilities. Here, the ALJ found, and all parties concede, that the employer eventually would have closed Del-Val because it was unprofitable. The employer now argues that once it is found that the decision to close is made on economic grounds, that is the end of the *Darlington* inquiry. The General Counsel argues, and the ALJ found, that the implementation and timing of the economic decision to close can be an unfair labor practice. We agree for two reasons.

First, such a rule can be derived from *Darlington* itself. The Supreme Court stated:

> [A] partial closing is an unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect.

380 U.S. at 275, 85 S.Ct. at 1002.

The Court's emphasis on purpose and effect is significant. Normally, the proper moment of time at which an employer's motive is assessed is the time at which the alleged unfair labor practice is committed. *See, e.g., Great Chinese American Sewing Co. v. NLRB*, 578 F.2d 251, 255 (9th Cir. 1978) (per curiam) ("The fact that industry conditions may have changed after the closing, and might now provide a business justification for GCA's decision to subcontract abroad does not alter the fact that anti-Union animus motivated the closing and subcontracting when they occurred."). In addition, the effect of a person's actions normally is measured by looking at the circumstances surrounding the action at the time it in fact occurred. Because the Court spoke in terms of purpose and effect, it would seem that the inquiry should focus on what the employer did in fact, which by

necessity includes how the employer did it. In short, looking at the employer's decision-making process alone is not enough for a proper assessment of the *Darlington* factors. Both elements focused on in *Darlington* cannot be measured properly unless the manner in which the employer implements its decision is carefully scrutinized.

Thus the employer's argument misreads the thrust of *Darlington* by saying that an economic decision is sufficient regardless of the chilling effect on unionism. The Supreme Court's emphasis on purpose and effect means the inquiry may not stop with the basis for the decision but also must consider the manner in which it is implemented. That the employer would have closed anyway in December 1976 in no way diminishes the fact that the employer's actions, when they occurred in June 1976, had the purpose and effect of chilling unionism.

Second, more generally we have often held that the timing and implementation of an otherwise valid economic decision may constitute an unfair labor practice. *E. g., Frito-Lay, Inc. v. NLRB*, 585 F.2d 62, 66 (3d Cir. 1978) (timing of previously planned wage increase manipulated to influence election); *NLRB v. Eagle Material Handling Co.*, 558 F.2d 160, 170 (3d Cir. 1977) (timing of layoffs). In addition, we have held that anti-union animus need not be the employer's sole motivation in a case of partial closing. *Id.* at 169–70. These two rules provide support for the proposition that valid economic reasons may not shield the employer where it has the additional motive, as shown by timing, of chilling unionism.

Here, there was substantial evidence of the employer's purpose and the effect of the timing of the Del-Val closing. The decision to close was made in a secretive manner, and then announced suddenly and widely right before the election. *Cf. General Teamsters & Allied Workers v. NLRB*, 138 U.S.App.D.C. 312, 427 F.2d 582, 586 (D.C.

Cir. 1970) (timing of wage increase coupled with widespread publication of it). Phillips's statement to Kline that the closing would affect the election shows both the employer's purpose and that it knew the reasonably probable effect of the closing. The letters and meetings with the employees at Nylomatic, which constitute independent unfair labor practices, confirm this view of the employer's actions. As we have already noted, there was substantial evidence that the employer had no reason for telling the employees of the decision to close. A pattern of unfair labor practices often is used to show anti-union animus.

The employer argues that it had no choice but to close because customers withdrew their molds. We find this unpersuasive. The employer has offered no reason why it had to tell its customers prior to the election. Although one witness testified that the employer decided on June 18 to tell the customers immediately, he gave no explanation for this other than to say that the customers might not want to place orders with a plant that was closed. The employer well knew that customers might withdraw their molds, and the ALJ apparently believed that its hasty notice to them precipitated their withdrawal.

Indeed, the ALJ found that the employer had enough work to keep Del-Val open until the end of 1976. The employer disputes this finding, but it is supported by substantial evidence. The witnesses disagreed about how much work there was in June of 1976, and we cannot now substitute our judgment about which witnesses were correct.[5] In short, the evidence supports the theory that the employer precipitated the customer withdrawals and hastened the closing sooner than was economically justified. The employer may not now profit from its own conduct by claiming that the withdrawals of orders required a fast closing.[6]

---

5. For example, Long, the local president, testified that he saw the number of orders on a desk and was generally familiar with the workload at the plant. He then stated how many presses

could have been run and for how long. His totals came to approximately six months.

6. The evidence surrounding the start of the vacation and the election is ambiguous. One

■ We hold that there was substantial evidence to support the finding that the employer timed and implemented the closing at Del-Val for the purpose of chilling unionism at Nylomatic.

## III. Remedy

### A. Bargaining Order

■ The Board may issue a bargaining order in one of two situations: in exceptional cases of outrageous and pervasive unfair labor practices (a *Gissel I* order), or where the unfair labor practices, though less pervasive, tend to undermine the union's majority strength and make a fair election unlikely (a *Gissel II* order). *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–15, 89 S.Ct. 1918, 1939–40, 23 L.Ed.2d 547 (1969).

Here, the Board issued a *Gissel II* order. The ALJ first found that the Ceramics Workers had 38 authorization cards, which the employer does not contest, which constituted a majority of the employees in Unit A, the production and maintenance unit. The ALJ then concluded that it "necessarily" followed from the nature of the unfair labor practices, especially the implied threats and the timing of the closing, that a fair election could not be held.

■ This reasoning is supported by substantial evidence. Some of the employees testified that the announcement of the closing affected their vote. Of those who denied it, it was for the ALJ to assess their demeanor. Indeed, a closing is the penultimate threat for an employee, and its psychological effect is at least as likely not to dissipate as other unfair labor practices we have held to justify a *Gissel II* order. *E.g., NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc.*, 585 F.2d 79 (3d Cir. 1978) (threat to fire employees if they vote

for union); *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 164–68 (3d Cir. 1977) (numerous violations, including solicitation of grievances, promises of future benefits, discharge of an employee, and threats to cancel some of the work).

Moreover, this case has all of the elements that we recently noted are common where we have held a *Gissel II* order proper. *See Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144, 149–50 (3d Cir. 1979). First, the implied threat was communicated to a "significant percentage of employees in the bargaining unit." Both the letter and the meetings involved every employee at Nylomatic. Second, the unfair labor practices involved senior company officials. They controlled the timing of the closing. The operations manager sent out the June 23 letter and posted the notices, and the June 29 meeting was run by him and the labor management relations manager and the sales manager. Finally, because the finding rests ultimately on a psychological impact on all the employees that is unlikely to dissipate, the factors undermining the first election would be present at any future election.

The employer offers two reasons why we should not enforce this *Gissel II* order. First, it contends that although the Ceramics Workers had a majority in Unit A, it did not have one for the entire plant. The employer contends that the Board gerrymandered the units so that it could issue the bargaining order.

Initially, the regional director set the units on June 10, long before the employer told anyone of its decision to close Del-Val. We decline to say that the regional director had prescience that enabled him to anticipate the employer's conduct. Moreover, the Board has considerable discretion in setting

witness testified that the decision to go on vacation was made in January 1976. Yet this was the first time the employer shut down the entire Del-Val plant for vacation, and July 1 was a Thursday. In any event, even assuming that it was pure coincidence that the vacation started the same day as the election, there was substantial evidence that the employer capitalized on it. In the first place, the employer

precipitated the withdrawal of customers' orders in a short space of time. Moreover, the employer would not state a time table for the closing despite union and individual employee requests. Thus on July 1, when the employees at Nylomatic went to vote, there was a general atmosphere of uncertainty as to whether Del-Val would ever reopen after the vacation to do more work.

the bargaining units, and we see no abuse of that discretion here, *E.g., NLRB v. Puritan Sportswear Corp.*, 385 F.2d 142 (3d Cir. 1967) (per curiam). Indeed, the very division of units at Nylomatic is the same as that at Del-Val and is quite common.

Second, the employer argues that the Board's orders as to Units A and B are inconsistent. The employer says that because the unfair labor practices made a free election impossible in Unit A, it must have had the same effect in Unit B. The employer claims that because the Board "permitted" a re-election in Unit B, its *Gissel II* order as to Unit A is inconsistent.

■ Such an argument rests on a misperception of Board practice and rules. Although the mere fact that the union participates in an election and loses will not foreclose it from seeking a bargaining order in a subsequent unfair labor practice proceeding, *see Bernel Foam Products Co.*, 146 N.L.R.B. 1277 (1964), no bargaining order will issue unless the election has been set aside in a representation proceeding. *See Irving Air Chute*, 149 N.L.R.B. 627 (1964), *enforced*, 350 F.2d 176 (2d Cir. 1965). The theory behind this rule is that the absence of a valid, outstanding election justifies a bargaining order. *See Photobell Co.*, 158 N.L.R.B. 738 (1966).[7]

The crux of *Irving Air Chute* is that the union first must have the election set aside in a representation proceeding and then start an unfair labor practice proceeding to get a bargaining order. Indeed, in the representation proceeding here, the union tried to get a bargaining order. The regional director refused to consider the request, noting that the unfair labor practice proceeding was the proper forum for that claim. Thus, contrary to what the employer claims, the setting aside of the election in a representation proceeding does not express a view one way or the other as to whether a new election should be held or whether a bargaining order is more appropriate.

Here, the unfair labor practice charges filed by the union relate only to Unit A. At no time has the union asked for a bargaining order in Unit B. The Board did not hold that an election was possible in Unit B but not in Unit A. Instead, it merely set both elections aside in a representation proceeding and the union, for whatever reason, filed unfair labor practice charges relating only to Unit A. Although the Board has some latitude to expand the scope of the charge, it may not reach matters clearly not included in the scope of the complaint nor shown by the evidence at the hearing. *See generally Amax Coal Co. v. NLRB*, 614 F.2d 872, 884–85 (3d Cir. 1980).

■ In short, neither the representation proceeding nor the unfair labor practice proceeding involved the appropriateness of a *Gissel II* order in Unit B. Thus the NLRB did not make inconsistent findings because it was never presented with the question of whether a free election could be held in Unit B.

We will enforce the *Gissel II* bargaining order here.

### B. ˙ Back Pay

■ The employer argues that the Board's order of back pay to all Del-Val employees is improper because the employer negotiated an agreement with the Tool Makers as to the effects of the closing. We enforce this order for two reasons.

First, the back pay remedy is not designed to remedy a violation of § 8(a)(5) for failure to bargain about the effect of the closing. It remedies the separate unfair labor practice of closing the plant in violation of § 8(a)(3) for the purpose of chilling unionism at Nylomatic. The ALJ's order carefully distinguishes the remedies on this basis, limiting the § 8(a)(5) remedies to the Ceramics Workers. We have already noted that there was substantial evidence that Del-Val would have stayed open until December 1976. Because the early closing harmed all the Del-Val employees and because any agreement as to severance pay

---

**7.** We need not decide the correctness of the *Irving Air Chute* doctrine because the union

here complied with all the procedural requirements of the Board's cases.

with the Tool Makers would not remedy the lost pay due to the premature closing in violation of § 8(a)(3), the remedial order was not an abuse of discretion.

Second, we have often held that remedial orders directed to non-parties are appropriate if fairly encompassed in the complaint and adequately proved at the hearing. *E. g., NLRB v. Midwest Transfer Co.,* 287 F.2d 443 (3d Cir. 1961) (back pay given to seven discharged employees proper even though only two filed charges). Here, by its very nature a closing affects every employee at a plant, and the evidence at the hearing was in no way limited to the effect of the closing on only the Ceramics Workers.[8]

We will enforce the Board's order of back pay to all employees at Del-Val.

### C. *Other Remedial Provisions of the Order*

▉ Finally, the employer claims that the Board improperly ordered preferential hiring lists and relocation expenses for Del-Val employees if the employer chose not to reopen the plant. It argues that this is forcing the employer to agree to contract terms over the effect of the closing in violation of *H. K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). That case holds that where the employer violates its duty to bargain in good faith, the Board may not then set contract terms between the union and the employer.

We need not decide whether preferential hiring lists and relocation expenses would violate the *H. K. Porter* doctrine if they rested on the employer's refusal to bargain about the effects of the closing alone. *See generally NLRB v. W. R. Grace & Co.,* 571 F.2d 279, 283 (5th Cir. 1978). Here, these remedies serve to correct two unfair labor practices: both the failure to bargain over the effect of the closing, which violated § 8(a)(5), and the improper closing of Del-

Val to chill unionism, which violated § 8(a)(3). Thus there is more here than imposing contract terms for a violation of the duty to bargain, which was all that was involved in *H. K. Porter.* The additional violation of § 8(a)(3) removes the case from the ambit of that doctrine because the remedy here is designed to restore, as much as possible, the situation prior to the closing, not to impose contract terms on the parties. *See generally Summit Tooling Co.,* 195 N.L. R.B. 479, 480–81 (1972), *enforced without opinion,* 474 F.2d 1352 (7th Cir. 1973). *See also Darlington Manufacturing Co. v. NLRB,* 397 F.2d 760, 773 (4th Cir.) (affirming without discussion), *cert. denied,* 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1968). We do not think it was an abuse of discretion to grant this remedy in the present § 8(a)(3) context.

We will enforce the order of preferential hiring lists and relocation expenses.

### IV.

We will deny the employer's petition for review. We will enforce all portions of the Board's order.

WEIS, Circuit Judge, concurring and dissenting.

I concur with the result reached by the majority, except with respect to enforcement of the bargaining order.

The Board adopted the ALJ's finding that the company committed an unfair labor practice in disclosing to Nylomatic employees the decision to shut down the Del-Val facility. He conceded that the closing was brought about by economic conditions and that it was necessary to notify the landlord before June 30. Nevertheless, the ALJ believed that the company could have advised the landlord without also informing the Nylomatic employees before the July 1

---

**8.** This is in no way inconsistent with our previous statement that the charge acted as a limit on the Board's power to order a *Gissel II* order in Unit B at Nylomatic. The complaint merely mentions the closing of the entire Del-Val plant but limits itself to Unit A at Nylomatic. Moreover, the evidence at the hearing on Del-Val related to the entire plant, but the evidence as

to Nylomatic was limited to Unit A. Indeed, no employee in Unit B was either named (names were deleted from the list of card signers) or called to testify, and the general counsel's attorney stated that she was not presenting evidence as to Unit B. Thus neither the complaint nor the evidence put Unit B into issue.

election. At the same time, however, the ALJ concluded that the company violated its duty to bargain over the closing of the Del-Val plant.

It is inherently inconsistent for the Board to fault the company for not sooner releasing news of the planned shutdown of the Del-Val plant to the unions representing those employees and in the next breath to find that the employer was unfair in disclosing the same information to Nylomatic employees. Had the employer negotiated with the unions before closing the plant, discussions would have had to have taken place sufficiently in advance of June 30 to allow adequate time for effective action. During that period, rumors of the possible closing undoubtedly would have made their way to the Nylomatic plant. Such news travels fast and it is unrealistic to believe that it could have been kept secret, particularly since some employees worked at both plants.

Thus, if the company had complied with its duty to negotiate about Del-Val's shutdown, the employees at Nylomatic would have known before the election that closing the plant at Del-Val was under very serious consideration. It follows, therefore, that the Board is inconsistent in concluding that the company should have withheld information about that eventuality until after the election on July 1.

Moreover, I fail to see why it was undesirable for the Nylomatic employees to be fully aware of conditions at the related plant before voting. Concealing information about the Del-Val closing would have amounted to nothing less than deception. One of the primary purposes of federal labor law is to protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing . . . ." 29 U.S.C. § 151. Interference with the dissemination of facts necessarily impinges upon an employee's exercise of choice by denying him the opportunity to be fully informed.

Underlying the Board's approach is a patronizing attitude toward the workers' ability to make an intelligent decision. The Board evidently doubts that the employees are mature adults who are entitled to relevant and truthful information useful in making a considered choice. To "protect" them, the agency apparently would spoon-feed only those matters that it deems safe for them to learn. I cannot agree with that philosophy or with the Board's finding that the failure of the company to conceal that that fact of the plant closing was an unfair labor practice.

Because I believe, however, that the voters should be given accurate information, I concur in the Board's determination that the letter sent by the company to Nylomatic employees discussing that plant's future was so exaggerated as to be deceptive. This "gloom and doom" report implied that the company was seriously concerned about Nylomatic's survival. Testimony of one of the company's vice-presidents, however, established that the Nylomatic plant was, in fact, highly profitable. Although the plastics industry had suffered a general downward trend the year before, there was no evidence suggesting that Midland-Ross was seriously considering the shutdown of Nylomatic.

The June 23 letter insinuating that the Nylomatic operation was on the brink of financial disaster and that the employees' decision to unionize could be crucial to survival was an unfair labor practice serious enough to require setting aside the election. In *Aircraft Radio Corp. v. NLRB*, 519 F.2d 590 (3d Cir. 1975), this court held that material misrepresentations should result in a new election. That ruling applies whether the misstatement is made by the union or management. In the case at bar, management should not be permitted to retain the possible benefits of its inaccurate representations.

That does not mean, however, that a bargaining order is justified. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), held that such orders are proper in instances where the Board determines that the unfair labor practice has a "tendency to undermine majority strength and impede the election

processes." *Id.* at 614, 89 S.Ct. at 1940. The Court clearly contemplated, however, that before issuing such an order, the Board would determine whether

> "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order . . . ."

*Id.* at 614–15, 89 S.Ct. at 1940.

This court has shown particular sensitivity to the drastic character of *Gissel* bargaining orders by requiring specific Board findings that traditional remedies would not ensure a fair rerun election. In *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239 (3d Cir. 1976), we said:

> "In light of the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes, a rule requiring the Board to set forth a reasoned analysis justifying a bargaining order under *Gissel* is salutary."

*Id.* at 244. In a later case, the court reemphasized that "the Board is required to 'clearly explicate its reasons for issuing a bargaining order *and include findings as to why a fair election cannot be held.*'" *Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1150 (3d Cir. 1977), *quoting NLRB v. Armcor Industries, Inc., supra* at 244 (emphasis added by *Hedstrom* court).

The rationale behind this court's holdings is clear: acceptance of Board "expertise" to support conclusory "boilerplate," without a reasoned analysis, does not comport with proper judicial review. Studies have cast doubts on the existence of such expertise, *see* Getman and Goldberg, *The Myth of Labor Board Expertise,* 39 U.Chi.L.Rev. 681

(1972); Samoff, *N.L.R.B. Elections: Uncertainty and Certainty,* 117 U.Pa.L.Rev. 228 (1968), and, moreover, the subject matter is not so complex or ethereal that it cannot be understood by members of the third branch.

Routine issuance of bargaining orders after a review of the facts and a conclusory finding that the unfair labor practices were "egregious," "pervasive" or "chilling" is simply unacceptable.[1] Bargaining orders have been defended as a necessary sanction to deter misconduct by an overreaching employer,[2] but such orders do not affect the employer alone—they also fall on employees. It is they who lose the right to vote in favor of one union or another or none at all—rights that the National Labor Relations Act guarantees to them. Moreover, the Board's remedies should right the wrong—not act as punitive measures. *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

In imposing bargaining orders, the Board is subordinating the employee's right to express his choice to its forecast as to who would have won the election if the employer had maintained laboratory conditions. When that prediction is little more than a guess, however, the Board's paternalism does not justify depriving the employees of their vote. The extreme response of a bargaining order should be the exception and not the norm—a principle recognized by this court in *Armcor* and *Hedstrom.*

The Court of Appeals for the Fourth Circuit commented on the problem in *NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988 (4th Cir. 1979). The court found that the ALJ had recommended a bargaining order without considering the "'residual impact' of [the unfair labor] practices, 'the likelihood of recurring misconduct' on the [company's] part, or 'the potential effect of ordinary

---

1. Two commentators have charged that the Board has developed a chronic "knee jerk" reaction after *Gissel.* Without providing "any sure basis for determining when and under what circumstances a bargaining order will be granted" the Board has repeatedly and without explanation simply "played trump." Christensen & Christensen, *Gissel Packing* and "Good Faith Doubt": The Gestalt of Required Recognition of Unions Under the NLRA, 37 U.Chi.L. Rev. 411, 445–46 (1970).

2. *See* Note, "After All, Tomorrow Is Another Day": Should Subsequent Events Affect the Validity of Bargaining Orders?, 31 Stan.L.R. 505 (1979).

992

remedies,' such as the issuance of an 8(a)(1) order." *Id.* at 997, *quoting Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1121 (7th Cir. 1973). Instead, the ALJ simply pronounced the "magic words 'pervasive and egregious'" before issuing the bargaining order. *Id.* Accordingly, the court properly refused to enforce the Board's order.

In the case at bar, the Board failed to show that the possibility of ensuring a fair rerun by the use of traditional remedies "is slight." *NLRB v. Gissel Packing Co., supra* at 614, 89 S.Ct. at 1940.[3] Although timing of the plant closing was said to have had a "chilling" effect on the workers, the Board did not attempt to explain why the majority in Unit A was undermined while that in Unit B survived and won the election. The same speeches were given and letters sent to both groups. Yet the employees in Unit A voted by a considerable margin[4] against the Ceramic Workers union while the workers in Unit B selected the Tool Makers as their representative. If the unfair letter of the company did not defeat the Tool Makers in this election, it seems highly unlikely that its influence was so pervasive or long-lived as to prevent a fair rerun election in Unit A. The fact that the Tool Makers local won its election and the Ceramic Workers local did not also raises the possibility that the employees were voting against that local specifically and preferred to be represented by some other union.

The Board failed to discuss the possibility of applying other, less extreme corrective measures. The employer could have been required, for example, to send to each voter an accurate account of Nylomatic's financial posture and future prospects prepared by a competent, disinterested party. Such a disclosure would be very effective in correcting the misinformation circulated by the company without infringing on the employees' rights. Other remedies might be devised that would be directed to remedy-

ing the wrong and not penalizing the innocent bystanders—the employees. This is particularly true if the Board's order rests solely on the misleading letter and not the closing of the Del-Val plant.

The record furnishes no support for the conclusion that a fair rerun election could not be held. Accordingly, I dissent from the majority's enforcement of the bargaining order.

---

3. It has been noted that many unfair labor practices that appear coercive in fact have the opposite effect—they "may rally the voters against the employer instead of frightening them into submission." Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 41 (1964).

4. The vote was 37–28 against the union.